IN THE UNITED STATES DISTRICT FOR
THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | |
|---|---|
| **JEROME SCHMIDT** | **NO. 1:18-CV-88-DAE** |
| Plaintiff | |
| vs. | |
| **UNITED STATES OF AMERICA**, | |
| Defendant | |

## PLAINTIFF'S PROPOSED FINDINGS OF FACT & CONCLUSIONS OF LAW

This case arises out of a motor vehicle wreck between an employee of the United States Department of the Navy and Plaintiff Jerome Schmidt on October 13, 2015. Under Rule 52(a)(1), this Court issues its findings of fact and conclusions of law in this action tried on the facts between November 18–22, 2019. The Court granted summary judgment on liability, so this case is tried on the issue of damages only. *See* Order Grant. Pl.'s Mot. Partial Summary. J., ECF No. 65 (June 5, 2019).

The Court has reviewed the record and the evidence presented at trial and the arguments of the parties. The Court has made determinations as to the relevancy and materiality of the evidence, assessed the credibility of the witnesses, and ascertained for its purposes the probative value of the evidence. After such consideration, the Court finds the following facts to have been proved by a preponderance of the evidence, and after applying the applicable law to such facts, makes the following conclusions of law.

## PARTIES

Plaintiff, Dr. Jerome Schmidt, is a veteran of the United States Army and was honorably discharged at the rank of 1st Lieutenant, Armor (A Co. 1/69 Armor, 4th Infantry Division). In the military, Dr. Schmidt served as a tank platoon leader during the Vietnam War, eventually being promoted to Scout Platoon Leader. For his conduct in the War theater, the Government awarded him a Bronze Star with "V" for valor.

After his honorable discharge, Dr. Schmidt trained as psychologist, with a specific focus in helping veterans. First, in 1972, he received his bachelor's degree in psychology from Trinity University. Then he earned his doctoral degree from Louisiana State University, also in psychology, in 1976. And since then, he practiced as a clinical psychologist. At the time of the wreck, Dr. Schmidt worked part time in private practice.

The Defendant in this case is the United States of America.

## JURISDICTION & VENUE

The substantive law of the State of Texas applies to this lawsuit as the acts or omissions complained of in this lawsuit occurred in Austin, Texas. 28 U.S.C. § 1346(b)(1).

The United States District Court for the Western District of Texas has jurisdiction over this case under 28 U.S.C. §§ 1346(b), 2401, and 2671–80.

Venue is proper in this district pursuant to 28 U.S.C. § 1402(b) because the United States is a defendant and Plaintiff resides in this district. Additionally, venue is proper because a substantial part of the events or

omissions giving rise to the claim occurred in this District. *See* Gov't Answer, ECF No. 8, at 2 ¶ 6.

The United States received notice of the claim underlying this lawsuit when Plaintiff presented these claims administratively to the Department of Navy on August 14, 2017. Plaintiff amended his claim under 28 C.F.R. § 14.2(c) and 32 C.F.R. § 536.29(c) on October 2, 2017. Plaintiff's administrative claim set forth an *ad damnum* of $8,000,000. The Government finally denied Plaintiff's claim on December 13, 2017. Plaintiff filed this lawsuit within six (6) months of the final denial. Accordingly, Plaintiffs have complied with all jurisdictional prerequisites and conditions precedent to the commencement and prosecution of this suit. *See* Gov't Answer, ECF No. 8, at 2 ¶ 10.

Plaintiff properly served the United States, and it has properly appeared in this suit.

## AGENCY

The remedy against the United States under the Federal Tort Claims Act is exclusive with regard to claims based upon torts of federal employees within the scope of their employment. 28 U.S.C. § 2679.

The United States Department of the Navy is an agency of the United States of America. The Defendant, United States of America, through its agency, the United States Department of the Navy, at all times material to this action, employed Edward R. Saylor, the driver of the other vehicle involved in the wreck. Mr. Saylor was, in October 2015, an active duty member of the United States Marine Corps. At all times material to this action, USMC Saylor was an agent, servant, or employee of the United States

of America acting within the course and scope of his employment. *See* Gov't
Answer, ECF No. 8, at 2 ¶ 9.

# FACTS

On October 13, 2015, USMC Edward Saylor drove a Navy cargo van
southbound on South Lamar Blvd., in Austin, Texas at approximately
2:30pm. At around 2:32 pm, Saylor approached the intersection of Lamar &
Manchaca. There, he attempted an unprotected left turn on to Manchaca and
collided head-on into a maroon Toyota 4-runner, which was driven by Dr.
Jerome Schmidt.

Dr. Schmidt wore his seat belt, but the 40-mile-per-hour collision caused
his airbags to explode. Dr. Schmidt's head hit the airbag, and then bounced
back, in what's known as a coup-contrecoup motion.

The wreck totaled Dr. Schmidt's Toyota 4-runner, causing primary
damage to the front of the vehicle. Witnesses, Dr. Schmidt, and Edward
Saylor called the Austin Police Department. After interviewing the witnesses
and the parties, the Austin Police Department cited Saylor for failure to
yield. Because the wreck totaled Dr. Schmidt's vehicle, a friend drove Dr.
Schmidt to pick up a rental vehicle.

At around 4:50pm—about two hours after the collision—Dr. Schmidt
checked himself into the Seton Emergency Room. Dr. Schmidt's chief
complaint was neck pain and pain throughout the left side of his body. That
he complained of neck pain indicates that his head and neck moved in a
fashion consistent with the coup-contrecoup motion and experienced the

forces associated with such a motion. Dr. Schmidt also complained of numbness in one of his fingers, indicative of nerve-related problems.

At 5:27pm, Seton ER doctors took a non-contrast head CT, which a radiologist interpreted as "Normal non-contrast CT head for age." At 8:08pm, providers noted that Dr. Schmidt needed an MRI. Because Seton could not timely provide him an MRI, Seton sent Dr. Schmidt to Breckenridge Emergency Room. But after waiting at Breckenridge ER until nearly midnight, Dr. Schmidt asked to be discharged and to follow up with his primary care doctor.

Following the wreck, Dr. Schmidt experienced two primary types of harm. First, the wreck resulted in traumatic brain damage. Second, the wreck caused Dr. Schmidt's dormant back problems to resurface and deteriorate drastically. The Court will take each in turn.

### 1.   *Traumatic Brain Damage*

On October 14, the day after the wreck, Dr. Schmidt presented to Dr. Kenneth Bunch. Dr. Schmidt stated that he was there for an "urgent visit [secondary] to an MVA." He complained of neck, mid, low back pain, headaches, and mental fogginess and anxiety, and difficulty sleeping. Dr. Bunch prescribed medications and set a follow-up visit for two weeks.

The next day, on October 15, 2015, Dr. Schmidt presented to Dr. Andrea Raymond, a neurologist. He complained of "weepiness," persistent sleep disturbance, and memory and cognitive issues. He also started experiencing blurred vision, even with the use of his prescription glasses. He also reported dizziness and headaches, feelings of stress, and difficulty concentrating. After an examination, Dr. Raymond diagnosed Dr. Schmidt with post-concussive

syndrome and ordered an MRI of his brain without contrast. She noted that if his symptoms persist, he will need a formal neurocognitive evaluation.

In the day's following the wreck, Dr. Schmidt noticed that he was not able to complete his work with the speed or thoroughness he had prior to the wreck. Eventually, Dr. Schmidt had to give up the practice of psychology entirely as a result of his cognitive disability.

On October 22, 2015, radiologists at Austin Radiological Association took an MRI of Dr. Schmidt's brain. They had an MRI from 2013 to compare. They interpreted the 2015 MRI as normal.

On October 30, 2015, Dr. Schmidt again presented to Dr. Raymond. She noted Dr. Schmidt started noticing memory loss, cognitive slowing, and anxiety in the three weeks following the wreck. She gave Dr. Schmidt a basic neuropsychological test known as the Montreal Cognitive Assessment. It showed delayed recall and verbal difficulties. Concerned for persistent neurocognitive difficulties, Dr. Raymond referred Dr. Schmidt to the Austin Center for Therapy & Assessment for formal and comprehensive neuropsychological testing.

On November 16th and 25th, 2015, Dr. Wayne Dees subjected Dr. Schmidt to a series of neuropsychological tests. These tests showed Dr. Schmidt's intellectual functioning ranged in the superior range, with an IQ surpassing the 91st percentile. He also demonstrated highly developed abilities in the areas of math, spelling, and reading skills. However, the results showed a discrepancy between his intellectual and academic functioning when compared to memory and cognitive testing.

- The tests also showed problems with processing speed and attention.

- And Dr. Schmidt's verbal memory and short-term memory was found to be low average, with borderline performance in his overall long-term memory.

- He demonstrated low average short-term narrative memory in his recall of orally presented stories, with severely impaired long-term memory of those stories.

- Dr. Schmidt faced trouble with executive functioning and problem-solving skills in relation to his intellectual and academic functioning.

- Depression screening noted mild signs of depression, with moderate difficulties with concentration and concerns for anxiety.

In sum, Dr. Dees concluded that the results of the neuropsychological evaluation are consistent with symptoms of a Major Neurocognitive Disorder, secondary to traumatic brain damage: "His cognitive deficits interfere with daily functioning, including work activities and concentration, and are consistent with front-temporal line impairment."

Over the course of the next year, Austin Center for Therapy & Assessment prescribed for Dr. Schmidt over forty-seven (47) visits to cognitive therapy. Dr. Schmidt continued to present to his providers with issues related to his traumatic brain damage, including memory issues, anxiety, personality change, and difficulty concentrating.

And multiple, objective tests corroborated Dr. Schmidt's post-concussive traumatic brain damage diagnosis. For example, on March 7, 2016, Dr. Raymond administered an EEG. The EEG showed a focal structural abnormality and cortical irritability. After reviewing the EEG, Dr. Raymond

ordered a second neuropsychological test. First, a basic Montreal Cognitive Assessment showed delayed recall. And again, on October 3, 2016 she ordered a second EEG. This one confirmed the same focal structural abnormality seen on the last EEG.

On October 4, 2016, Austin Center for Therapy & Assessment again tested Dr. Schmidt through a series of comprehensive neurocognitive testing. Dr. Raymond referred Dr. Schmidt for re-evaluation due to "ongoing concerns with memory, mental confusion, and concentration post motor vehicle accident, where he suffered a closed head injury." The testing revealed an improvement from the immediate-post wreck testing, but also showed that Dr. Schmidt continued to exhibit neurocognitive problems secondary to the closed head injury. The results were still a significant decline from Dr. Schmidt's premorbid level of functioning, given his educational and work history. The results confirmed Dr. Schmidt's difficulties with forgetfulness, poor attention, and disruptions of other cognitive functions.

## 2. *Orthopedic Injuries*

After the wreck, Dr. Bunch offered conservative therapy to address Dr. Schmidt's new back pain after it failed to resolve with the help of medications. Initially, Dr. Bunch referred his patient to physical therapy to address the back pain. In the month following the wreck, Dr. Schmidt attended seven physical therapy appointments.

On November 19, 2015, Dr. Bunch supplemented the physical therapy by providing a fluoroscopic-guided transforaminal epidural steroid injection at the L3 and L4 levels of Dr. Schmidt's spine. In the following month, Dr. Schmidt went to physical therapy at least once a week. Then, on December 9,

2015, Dr. Schmidt followed up with Dr. Bunch. His doctor noted that his thigh pain had resolved, but he continued to have pain in his lower back. After a physical examination, Dr. Bunch recommended an MRI of the lumbar spine to help pinpoint the problem.

On December 12, 2015, Dr. Mark Auler performed and interpreted an MRI on Dr. Schmidt's lumbar spine. Dr. Auler discovered a new disc protrusion at the L4 & L5 level that impinges on the L5 nerve root in Dr. Schmidt's spine. It compressed the nerve root. Otherwise, he noticed no changes to Dr. Schmidt's spine after comparing this MRI to an MRI from 2011. After reviewing the MRI findings, Dr. Bunch called Dr. Schmidt and told him the results. Wanting to continue the conservative approach, Dr. Bunch recommended trying another transforaminal epidural steroid injection. So, after two more weeks of physical therapy, Dr. Bunch performed another fluoroscopic guided L4/L5 transforaminal epidural injection.

Between January and March 2016, Dr. Bunch saw Dr. Schmidt at least four times for continued back pain. In two of those four visits, Dr. Bunch again performed fluoroscopic-guided transforaminal epidural steroid injections. In April 15, 2016, on a follow up visit, Dr. Schmidt explained to Dr. Bunch that his left leg gave out. Throughout the summer of 2016, Dr. Schmidt continued to attend physical therapy.

On June 29, 2016, Dr. Raymond performed EMG testing to determine whether Dr. Schmidt's nerve conduction showed abnormalities. EMG testing would show if anything slowed down the electrical conduction of Dr. Schmidt's nerves. The test revealed electrophysiologic evidence of damage to Dr. Schmidt's left femoral nerve, which conducts signals to his left leg from the spinal cord, through the pelvis.

Dr. Bunch saw him next on July 6, 2016. He noted that the steroid injections provided some relief, but Dr. Schmidt's pain tended to return. Dr. Bunch also noted that his patient experienced another fall (making three in total since the wreck). Given his falls, and the damage to the femoral nerve as seen in the EMG, Dr. Bunch suggested that his patient consider surgical options and referred him to a neurosurgeon, Dr. K. Michael Webb.

After reviewing the imaging and history, Dr. Webb believed that the disc herniation at L4-5, as seen on the December MRI was compressing the L4 nerve root, which was "consistent with the majority of the symptoms" following the wreck in October 2015. As a result of the nerve root compression and because conservative treatments failed Dr. Schmidt, Dr. Webb recommended surgery. The need for surgery was a direct and proximate result of the wreck on October 13, 2015.

So, on August 5, 2016, Dr. Webb performed a total laminectomy with decompression of the lateral recess and bilateral foraminotomies. This spine surgery attempts to decompress the spinal cord by removing the bulging disc and providing support to Dr. Schmidt's spine. The spine surgery hospitalized Dr. Schmidt from August 5 to the 8th, at Lakeway Regional Medical Center.

Throughout 2016 to present, Dr. Schmidt attends regular visits to his medical team to address the constellation of symptoms caused by the motor vehicle wreck in 2015. This includes physical therapy, cognitive therapy, and orthopedics. At home, Dr. Schmidt tries to supplement his medical care with exercises and logic puzzles, as suggested by his providers.

## EXPERT TESTIMONY

Plaintiffs called the following experts: Dr. Erin Bigler, Dr. Jeffrey Lewine, Dr. Robert Thoma, Dr. Travis Snyder, Dr. Christine Vidouria, Dr. John Swiger, and Dr. Michael Freeman.[1] The Court finds these witnesses well qualified through skill, education, experience, knowledge, and training in their respective areas of expertise and finds that these witnesses provided credible and reliable testimony.

1.  ***Dr. Travis Snyder***

Dr. Travis Snyder is a board-certified radiologist with a certificate of added qualification (CAQ) in neuroradiology. Dr. Snyder graduated with a medical degree from Touro University Medical School in Las Vegas, Nevada. He has internships and residencies at Michigan State University, and the University of Miami. The states of Michigan, Florida, Nevada, Arizona, and California license Dr. Snyder to practice medicine. Dr. Snyder has an extensive neuroradiological clinical practice. Dr. Snyder has a research and

---

[1]   Dr. Michael Freeman is an epidemiologist and offered in rebuttal to the Government's testimony. He has a Doctor of Medicine (Med.Dr.) from Umeå University, Umeå, Sweden, a Ph.D. in Public Health & Epidemiology, a masters in Epidemiology & Biostatistics, and a Doctor of Chiropractic Medicine. He is a Fulbright Fellow, and holds a 3-year appointment (2017-20) with the United States Department of State as a Fulbright Specialist in the field of forensic medicine. He completed a 2-year post-doctoral fellowship in forensic pathology at Umeå University in Sweden, and a fellowship in pathology at the American Academy of Forensic Sciences. He is also a crash reconstructionist since 1996 and holds accreditation from the Accreditation Commission on Traffic Accident Reconstruction since 2005. Over the past 20 years, he has participated in the reconstruction of more than 2,000 crashes, including more than 300 fatalities. Since 1999, he has served as a vehicular homicide investigator for law enforcement (consultant to the state medical examiner and special deputy sheriff) and is currently an affiliate medical examiner with the Allegheny County Medical Examiner's office.

clinical focus on traumatic brain damage. Notably, Dr. Snyder does not personally profit from any of the legal consulting he does for this or any other case. He testified that all money he receives as a result of his legal consulting is used to fund research into traumatic brain damage.

Primarily, Dr. Snyder reviewed three sets of imaging. He reviewed an MRI of Dr. Schmidt taken pre-morbidly, in 2013. He reviewed the 2015 MRI taken almost immediately after the wreck. And he reviewed an MRI taken in 2018 as a part of this legal case. He also reviewed the medical records, neuropsychological testing results, and other objective tests, such as EEG, MEG, and plain radiology. Based on this review, Dr. Snyder concluded to a reasonable degree of medical certainty that the motor vehicle wreck on October 15, 2016 caused the cognitive deficits faced by Dr. Schmidt today.

First, he showed the Court that the findings on the images between 2013 and 2015 are almost identical. Stated another way, Dr. Schmidt's brain showed no changes between 2013 and 2015, including organic brain damage, Alzheimer's, or other dementias. However, between 2015 and 2018, Dr.

Snyder identified, and the Court could actually see on the films, visible brain damage:



*Figure 1: Snyder Film Comparison*

When Dr. Snyder compared Dr. Schmidt's brain atrophy to the rates reported in the literature, the atrophy exceeded the rates associated with natural dementia, Alzheimer's, or other disease processes. Dr. Snyder also identified hippocampal damage in the 2018 film. Dr. Snyder took the court through a study of trauma patients that provided an assessment on average 30 years after a traumatic brain injury found that a reduction in hippocampal volume and lateral ventricular enlargement were significantly associated with impaired memory functions, memory complaints and executive functions. Based on literature and the film review, Dr. Snyder ruled out alternative causes and concluded that the motor vehicle wreck caused the brain damage seen on the films.

Second, Dr. Snyder reviewed the medical records and noted that Dr. Schmidt had some complaints of memory problems prior to the 2015 wreck. Dr. Snyder testified that such complaints were not significant enough to show damage on the brain scans in 2013 or 2015. And importantly, like Plaintiff's

other experts, Dr. Snyder explained that traumatic brain damage is a disease process, not a single incident. Moreover, individuals have their own thresholds for brain reserve and the impact of traumatic brain damage will be specific to that individual. Dr. Schmidt's pre-existing memory problems alone cannot explain the imaging findings or his clinical course. Instead, it is more likely that his pre-existing memory issues lowered Dr. Schmidt's brain's threshold to sustain a traumatic incident.

## 2.   *Dr. Robert Thoma*

Dr. Robert Thoma is a neuropsychologist and professor of neuropsychology at the University of New Mexico School of Medicine's Department of Psychiatry. He received a masters and a doctorate in Clinical Psychology from the University of New Mexico. He has over twenty years of experience in clinical psychology. Dr. Thoma also has significant experience in advanced neuro-imaging techniques. For example, he was a postdoctoral fellow in neuropsychology and neuroimaging at the Center for Advanced Medical Technologies, in the Department of Radiology at the University of Utah. And he's published and presented hundreds of times in the area of clinical neuropsychology.

Working in concert with Plaintiff's other neuropsychologist expert, Erin Bigler, Dr. Thoma administered a series of neuropsychological tests on Dr. Schmidt over the course of two days in 2018. Based on the records and their examination, and to a reasonable degree of certainty, Dr. Thoma testified that the test findings are consistent with a hit to the face by an airbag and suffering a coup-contracoup brain injury pattern. Dr. Thoma's test results

showed that Dr. Schmidt functioned one to two standard deviations below the population average.

Further, Dr. Thoma concluded to a reasonable degree of medical certainty that Dr. Schmidt suffered cognitive deficits significantly below expectation in reaction time, motor speed, sustained attention, learning and memory, and confrontation naming. His findings were most consistent with a diagnosis of Neurocognitive Disorder, mild to moderate in severity, with behavioral disturbance. He attributed Dr. Schmidt's memory deficits to temporal lobe injury. Findings of generalized motor slowing, deficits in reaction time and in sustained attention are linked to injury to subcortical white matter communicating fibers. Dr. Thoma observed in Dr. Schmidt an intention tremor and problems with gait and balance, which suggested to him that the wreck caused injury to the pontine-cerebellar motor control system.

Additionally, Dr. Thoma could rule out natural disease processes as a cause of the cognitive problems Dr. Schmidt faces and can rule in traumatic brain damage as the cause. To explain, Dr. Thoma reviewed the neuropsychological testing conducted by Dr. Schmidt's treating doctors in 2015 and 2016 for comparison. He noted that Dr. Schmidt's test results between 2015, 2016, and 2018 remained stable:

 

*Figure 2: Thoma Test Comparison*

If an organic disease—such as dementia or Alzheimer's disease—causes the cognitive problems Dr. Schmidt faces today, one would expect a natural continued decline in functioning as time passes. Instead, Dr. Thoma found stability of deficits in most areas, and improvement in some areas, which is consistent with traumatic damage to Dr. Schmidt's brain as a result of the 2015 motor vehicle wreck.

### 3.   *Dr. Jeffery Lewine*

Dr. Jeffery Lewine is Professor of Translational Neuroscience at the Mind Research Network and an Adjunct Professor of Psychology and Neurology at the University of New Mexico. The Mind Research Network is a non-profit research institute located on the University of New Mexico campus. Including Dr. Lewine, it has 16 principal investigators and over 100 staff. The investigators include neuroscientists, psychologists, engineers, physicists, neurologists, and psychiatrists. Their facilities allow the investigators access to multiple imaging modalities, including MRI, fMRI, EEG, and Magnetoencephalography (MEG). The Mind Research Network publishes over 200 peer-reviewed scientific articles yearly and has a research portfolio of about $15 million per year in funding from federal agencies, including NIH, NSF, DARPA, DoD, and DoE.

Dr. Lewine has a bachelors, masters, and Ph.D. from the University of Rochester, with the latter two degrees from the School of Medicine. Following his doctorate, Dr. Lewine worked as the Director's Fellow at the Los Alamos National Laboratory in Biophysics and Neuroscience. And Dr. Lewine has nearly three decades of experience, training, and education in neuroscience and neuroscience testing modalities. He publishes and presents on these

subjects—as described in his extensive CV. He's produced over 60 peer-reviewed publications, one dozen book chapters, and is the co-author on a textbook on Functional Brain Imaging.

Over the course of a week in June 2018, Dr. Lewine and his team subjected Dr. Schmidt to a series of objective tests: EEG, qEEG, MEG, qMEG, MRI volumetric testing, audiology testing, and behavioral testing. He testified that he used multiple modalities because his method involves identifying a convergent validity in the mechanism of injury. Stated another way, no one test is both highly specific (*i.e.*, correctly identifying individuals without a particular condition as not having that condition) and highly sensitive (*i.e.*, correctly identifying a particular condition in someone who truly has that condition). But when a neuroscientist combines multiple modalities, they converge on a valid mechanism of injury. Based on his testing, Dr. Lewine reached four primary conclusions to a reasonable degree of neuroscientific certainty.

First, Dr. Lewine concluded the testing showed overwhelming evidence of brain damage based on structural and functional assessments:

- The neuropsychological testing showed significant, but stable, deficits in his performance in multiple domains (especially delayed memory);

- The behavioral testing showed impaired paired-associates learning, mildly impaired impulse control, impaired inter-hemispheric integration;

- The EEG testing—consistent with the treating doctor's EEG testing—showed abnormal bitemporal slowing, impaired functional connectivity as indexed by abnormally low coherence, especially in inter-hemispheric derivations;

- The MEG showed abnormal dipolar slow wave activity and sharp waves arising from the left temporal lobe; and

- Dr. Snyder's MRI findings showed evidence of substantial atrophy between 2015 and 2018 examinations at a rate beyond expectations for normal ageing.

Second, Dr. Lewine concluded the observations across assessments show convergent validity. Clinical and behavioral observations in combination with Neuropsychological testing point to neurobiological compromise of multiple brain networks and the interactions between them, especially with respect to those which support delayed memory processing. In support, Dr. Lewine offered both animal and human literature definitively linking delayed memory processing to hippocampal and associated temporal lobe networks.

Third, Dr. Lewine concluded that the overall profile is most consistent, to a reasonable degree of neuroscientific certainty, with a traumatic brain damage caused by the wreck in October 2015. He reasoned that the data simply does not support any other cause. For example, normal aging cannot account for the EEG, which shows abnormal slow waves and sharp transients are not seen in normal ageing. And during the 2015-2018 period, the amount of total brain atrophy is more than 2x expectations for normal ageing. This is also the case for the observed hippocampal atrophy. What's more, ventricular volume increases by more than 5x the expected rate for ageing. And the atrophy process accelerates markedly after the 2015 scan. In other words, the objective testing and data prove that the injury to Dr. Schmidt's brain cannot be explained by the ageing process.

As another example, the data also does not support any other organic cause of Dr. Schmidt's brain damage. Dr. Lewine explained the types of test results one would expect to see associated with organic or other brain

damage. But Dr. Schmidt's testing lacks almost all markers of non-traumatic brain damage, such as dementia.

Fourth and finally, to a reasonable degree of neuroscientific certainty, Dr. Lewine opined that Dr. Schmidt's clinical and neurobiological status was compromised by traumatic brain damage sustained in the wreck in October 2015. Dr. Lewine demonstrated the mechanism of injury most likely to be a secondary cascade of neuroinflammation and excitotoxic events that resulted in transient but significant loss of cells throughout the brain, especially in the hippocampus.

### 4.   *Dr. Erin Bigler*

Dr. Erin Bigler is a board-certified neuropsychologist with training, experience, education, skill, and knowledge in the areas of neuropsychological diagnosis and neuroimaging. Dr. Bigler co-edited the seminal textbook in the field, *Neuropsychological Assessment*, now in its 5th Edition. He wrote or edited many other texts in the field, including *Concussion & Traumatic Encephalopathy*, *Working with Traumatic Brain Injury in Schools*, *The Brain at Risk: Associations between Disease and Cognition*, *Diagnostic Clinical Neuropsychology*, *Neuroimaging I: Basic Science*, *Neuroimaging II: Clinical Applications*, and *Introduction to Clinical Neuropsychology*. He also authored multiple book chapters on neuroimaging, neuroanatomy, neuropsychology, traumatic brain damage, organic brain damage, and others. Dr. Bigler's 112-page CV lists his full publications and qualifications, which are too voluminous to list in this opinion.

Based on the review of the records, the examination of Dr. Schmidt, and Dr. Bigler's special expertise in neuropsychology and neuroimaging across

multiple domains, Dr. Bigler concludes to a reasonable degree of certainty that Dr. Schmidt's current cognitive deficits are the direct and proximate result of the wreck in 2015. Dr. Bigler testified that Dr. Schmidt's specific type of brain damage compromises his ability to function and are in all likelihood permanent in nature. Dr. Bigler's research in cognitive reserve allows Dr. Bigler to conclude that Dr. Schmidt's education and work history demonstrate a high cognitive reserve. That in combination with Dr. Schmidt's unique medical profile prior to the wreck set the stage for the subsequent traumatic damage to Dr. Schmidt's brain.

Dr. Bigler explained that modern science views traumatic brain damage as a disease process, not a one-time occurrence. The primary event—in this case a motor vehicle wreck—initiates a reactionary secondary cascade that permanently changes the patient's brain. But the secondary injury depends on the individual patient, including his or her history, co-morbidities, and specific brain chemistry. In Dr. Schmidt's case, the secondary injury cascade caused significant loss of neurons in the immediate months following the motor vehicle wreck.

### 5. *Dr. Christine Vidouria*

Dr. Christine Vidouria is a board-certified Physical Medicine & Rehabilitation doctor, and Pain Medicine specialist who has practiced medicine in Texas since 2001. She serves as the Medical Director for the HealthSouth Rehabilitation Institute of San Antonio and the Pain Management Program & Methodist Specialty Transplant Hospital in the acute rehab unit. And she earned her medical degree from The University of North Texas HSC—Fort Worth—Texas college of Osteopathic Medicine and a

Bachelor of Science in Microbiology from the University of Texas—El Paso in
El Paso, TX. Afterwards, Dr. Vidouria performed her residency at the
University of Texas Health Science Center—San Antonio in Physical
Medicine & Rehabilitations as well as a fellowship in Interventional Pain
Management.

The International Commission on Health Certification certified Dr.
Vidouria as a Certified Life Care Planner. Life care planning is a process of
applying objective methodological analysis to formulate diagnostic
conclusions and opinions regarding physical and/or mental impairment and
disability for the purpose of determining care requirements for individuals
with permanent or chronic medical conditions. Life care plans are used in
litigation as well as outside litigation. Outside litigation, for example,
insurance companies use life care plans to project costs. Patients and families
also use them to plan out future care needs. And case managers use them to
schedule and organize medical care for their clients.

  5.1.  **Method & Opinions**

Dr. Vidouria also has extensive experience in the cost of medical care and
associated medical needs. She also has access, through her professional work,
to reliable databases that aggregate medical costs. She uses these resources
and experience to price out the cost of medical care for Dr. Schmidt that
needs and that arises directly and proximately from the deficits caused by the
wreck on October 13, 2015.

Based on these qualifications, Dr. Vidoria offered several opinions to a
reasonable degree of medical certainty, which the Court adopts as reliable
and credible. First, Dr. Vidoriua opined that Dr. Schmidt has physical and

cognitive impairments and disabilities, which require lifelong medical care, as a direct and proximate result of the motor vehicle wreck on October 13, 2015. Dr. Schmidt's diagnostic conditions and consequent circumstances will adversely impact his vocational activities and opportunities, as well as his and his family's general quality of life.

Second, using the methodology advocated by the American Academy of Physician Life Care Planners and her own medical training and experience, she concluded that Dr. Schmidt has a residual life expectancy of 14 years. This life expectancy takes into account the potential impact of co-morbidities and Dr. Schmidt's medical history. Based on the permanence of Dr. Schmidt's physical and cognitive deficits, any life care plan will need to provide for care for this period of time to address Dr. Schmidt's future medical needs. Importantly, optimal medical care positively affects life expectancy and overall health outcomes for individuals with lifelong medical conditions, as optimal medical care mitigates many potential risk factors and complications associated with Dr. Schmidt's known medical conditions.

Third, based on a review of the record, a personal medical examination of Dr. Schmidt, and her background and qualifications, Dr. Vidoria testified that Dr. Schmidt's future care needs would require $288,447 annually. She broke this number down into specific items of care, which the Court will review. She testified that these care needs are above and beyond what any normal individual would use and are above and beyond any care needs for any pre-existing problems. Stated another way, these care needs are directly caused by the wreck and are specific to only the injuries resulting from the wreck.

5.2.  **Life care plan components**

Of the $288,447, Dr. Vidouria allocated $243,503 per year to the cost of a home health aide. She provided multiple reasons for this cost. For example, Dr. Schmidt's brain damage has caused him to live in isolation. After the wreck, for reasons discussed in the non-economic damages section of this opinion, he has found himself avoiding other people. As another example, before the wreck Dr. Schmidt could drive himself. Now, because of his memory problems, he often forgets where he's driving. Dr. Vidouria identified Dr. Schmidt's cognitive problems when driving—not only as a safety problem for himself—but also for others on the road.

Next, she testified that Dr. Schmidt's brain damage causes him to fail to do the things around the house that every independent adult needs to survive. And these failures also present a safety threat to Dr. Schmidt personally, but also his neighbors in his condo complex. For example, Dr. Schmidt's forgetfulness puts him at risk of leaving a kitchen burner on or oven on. And Dr. Vidouria testified, and the Court agrees, that the goal of a life care plan—and tort damages generally—is to compensate a plaintiff for a loss by restoring him to his previous level of independence to the extent possible through money damages. VICTOR E. SCHWARTZ, ET AL., PROSSER, WADE, & SCHWARTZ'S TORTS 520 (11th ed. 2005) ("[Compensatory damages are intended to] restore the plaintiff to the position the plaintiff was in before the tort occurred."); *Haygood v. De Escabedo*, 356 S.W.3d 390, 394 (Tex. 2011) (same). So, the Court finds reasonable and necessary a home health aide at the frequency described by Dr. Vidouria in her testimony.

Then, Dr. Vidouria assigns $33,764 annually for various physician services that Dr. Schmidt needs and the frequency at which he would need

them in the future. Examples include rehabilitation physicians, and orthopedic physicians' visits, and specific procedures, such as medial nerve blocks and injections. She also identified three other categories: (a) $3,435 yearly for diagnostic and laboratory services needed as a result of Dr. Schmidt's injury; (b) $4,986 per year medications and durable medical goods to treat the physical problems associated with Dr. Schmidt's spine and the cognitive issues related to his brain damages; and (c) $2,759 per year as the annual cost of physical therapy and case management services.

Of note, the types of future medical interventions recommended by Dr. Christine Vidouria mirror the recommendations made by Dr. Dees, the treating neuropsychologist, in 2015 and 2016, following the extensive multi-day neuropsychological testing. This includes neuropsychological interventions, psychopharmacological interventions, individual therapies, and support for activities of daily living, including cognitive rehabilitation.

### 6. *Dr. John Swiger*

Dr. John Swiger is a Professor Emeritus of Finance, Our Lady of the Lake University, in San Antonio, Texas. He has special expertise in finance and economics. Dr. Swiger received his doctorate in Finance from the University of North Carolina at Chapel Hill in 1976. Since the late 70s, Dr. Swiger taught finance and economics at the University of Texas at Austin, and then at Our Lady of the Lake University. He has multiple publications and presentations in economics.

Dr. Swiger took the future expenses that Dr. Schmidt faces and provided the Court a reliable and credible present value. Dr. Swiger explained to do this analysis, he first breaks the items of future needs into categories and

determines their future cost, using standard inflationary techniques. For example, inflation affects medical care items at a different rate than most other items. Taking differences like this into account, Dr. Swiger testified to the future annual cost of every item in the life care plan provided by Dr. Vidouria.

Then, Dr. Swiger determined the amount of money needed to be invested today such that the money would grow to meet the future need, given inflation. The Court finds this method "best and safest" investment approach reasonable and complaint with both state and federal law. *See Culver v. Slater Boat Co.*, 722 F.2d 114, 118 (5th Cir. 1983) (Rate to be based on the return available from "the best and safest investments," and to be computed after considering the effect of income tax on the interest received). To do otherwise encourages individuals to take unnecessary financial risks with money allocated for necessary future medical needs. Because these items of care relate to the health and safety of Dr. Schmidt and those around him, unnecessary financial risks should be avoided if at all possible.

Based on this analysis, Dr. Swiger concluded to a reasonable degree of financial and economic certainty that the net economic loss to Dr. Schmidt was $2,812,699. Within this analysis, Dr. Swiger also calculated the lost earnings. Given that Dr. Swiger calculated the loss based on Dr. Schmidt's previous part-time employment status, the Court finds this reasonable and adopts his analysis.

# DAMAGES

Under Texas law, "proximate cause" means a cause that was a substantial factor in bringing about the injury, and without which the injury would not have occurred. TEX. PATTERN JURY CHARGE: GENERAL NEGLIGENCE § 2.4 (2018). A person using ordinary care would have foreseen that the injury or some similar injury might result from the act or omission complained of. *Id.* There may be more than one proximate cause of an injury. *Id.; see also IHS Cedars Treatment Ctr. v Mason*, 143 S.W.3d 794, 798–99 (Tex. 2004). Generally, Texas law affords the trier of fact great discretion in considering evidence on the issue of damages. *In re State Farm Mut. Auto. Ins. Co.*, 483 S.W.3d 249, 263 (Tex. App.—Fort Worth 2016, no pet.). Where the plaintiff has uncontroverted, objective evidence of injury and the causation of the injury has been established, appellate courts are more likely to overturn a jury finding of no damages for past pain and mental anguish. *Id.* And under Texas law, the Government is responsible for any prior physical infirmity that it aggravated in the wreck on October 13, 2015. *Dallas Railway & Terminal v. Ector*, 116 S.W.2d 683, 507 (Tex. 1938).

The Court has also reviewed similar cases for an understanding of the appropriate damages in this case:

- *Ragan v. United States*, No. 5:1999cv00093, 2001 WL 36170312 (E.D. Tex. 2001) (**$10,612,806 FTCA verdict** for a moderate brain damage and orthopedic injuries resulting from motor vehicle wreck);

- *Metheny v. Drina Trans Inc.*, No. DC-16-10181 (Tex. Dist. Ct. 2019) (**$4,700,000 jury verdict** arising out of a motor vehicle wreck resulting in mild traumatic brain damage);

- *Black v. Grocer's Supply Co.*, JVR No. 356764, 1000 WL 41222 (Tex. Dist. Ct. 1996) (**$5,700,000 jury verdict** for 49-year-old who suffered a mild traumatic brain injury following a wreck);

- *Duenez v FFP Operating Partners, L.P.*, JVR No. 375849, 2000 WL 1204223 (Tex. 2000) (**$5,000,000.00 verdict** for a mild traumatic brain injury (TBI) in a head-on collision);

- *Bush v R&L Carriers, Inc.*, JVR No. 1406230028, 2014 WL 2854958 (Tex. Dist. Ct. Apr. 23, 2014) (**$4,088,000.00 verdict** for a mild TBI with memory loss, attention loss, executive functioning damage, and cervical disc injury in a rear-end collision. Defendant contested whether Plaintiff had a TBI.);

- *Harris v RamRod Enterp.*, JVR No. 494722, 2008 WL 4900696 (Tex. Dist. Ct. 2008) (**$4,000,000.00 settlement** for a mild TBI with memory loss and visual impairment when struck by a log at work);

- *Hosick v Morgantown Freight Line*, JVR No. 495723, 2002 WL 34454776 (Tex. Dist. Ct. 2002) (**$4,250,000.00 settlement** for mild TBI, memory loss, personality changes in a trucking collision.);

- *Molina v. United States*, No. SA95CA1204, 1996 WL 899071 (W.D. Tex. 1995) (**$2,000,000 settlement** with the United States for medical negligence that resulted in moderate brain damage);

- *L.G. v. United States*, No. SA CV 04-1045-AHS, 2007 WL 3022463 (C.D. Cal. 2007) (**$54,143,370 FTCA verdict** for minor child as a result of motor vehicle wreck causing severe brain damage and orthopedic injuries to a minor);

- *Klinefelter v. Faultersak*, No. 98 CV 909, 1998 WL 1061456 (E.D. Pa. 1998) (**$4,000,000 jury verdict** for a mild brain injury to a 69-year-old man after motor vehicle wreck).

Based on Texas law, the testimony of the witnesses, experts, and a review of the medical records, the Court concludes that Dr. Schmidt's brain

damage and associated cognitive deficits are the direct and proximate result of the traumatic brain damage he suffered in the motor vehicle wreck on October 13, 2015. The Court further concludes that Dr. Schmidt's associated back issues, including the surgery and treatments, also flow directly and proximately from the motor vehicle wreck. In all likelihood, these deficits that Dr. Schmidt currently faces are permanent. And but for the wreck, Dr. Schmidt would not have any of the issues described in these findings of fact and conclusions of law.

Based on the medical bills and testimony, Dr. Schmidt incurred **$85,296.23 in medical bills**. The Court finds these are reasonable and necessary amounts directly and proximately related to the wreck on October 13, 2015. And Dr. Schmidt has incurred and will incur **net economic losses of $2,812,699**.

The Court also finds that Dr. Schmidt has suffered and will continue to suffer significant non-economic harms. The cognitive issues that Dr. Schmidt faces are daunting. Dr. Schmidt lives life day-to-day feeling as if he lost a part of himself and his mind. As an illustration, this injury causes Dr. Schmidt isolation. Physically, Dr. Schmidt does not look disabled. When he interacts with others, they do not perceive him to have cognitive deficits. Dr. Schmidt gets frustrated when he is unable to hide his disability and others do not understand why he is forgetting their names, or even simple details like where he is and what he is currently doing. Instead of trying to explain, the literature shows that individuals with this disability will forgo interactions with others, leading to increased isolation. This is also another reason for the medical and supportive care offered in Plaintiffs' life care plan, as it helps Dr. Schmidt reintegrate with society. Moreover, Dr. Schmidt faces daily anxiety,

depression, and frustration arising out of his cognitive injury. For the last three years, Dr. Schmidt has tried yoga, exercise, sudoku, logic puzzles, and dozens of cognitive therapy appointments at the recommendations of his medical doctors. Dr. Schmidt's frustration at his failure to improve is difficult to imagine but understandable. And physical pain is a constant problem for Dr. Schmidt. For this reason, Dr. Schmidt's medical doctors have recommended, and Dr. Schmidt has undergone, at least eight (8) fluoroscopic guided steroidal injections. Likewise, Dr. Schmidt has attended dozens upon dozens of physical therapy appointments. As the expert testimony revealed, this physical pain is a permanent fixture in Dr. Schmidt's life. It's one that he cannot avoid but will have to learn to cope with.

Given the extent of non-economic harm in this case, the Court finds a reasonable amount of compensation is $250,000 per year. For the last four years, the past non-economic damages total $1,000,000. For the fourteen years of remaining life expectancy, the Court finds a reasonable amount of compensation is $3,500,000. Therefore, the Court awards a total of **$4,500,000 in non-economic damages**.

## CONCLUSION OF LAW

The Court finds in favor of Plaintiff the total damages in the amount of $7,397,995.23. But under 28 U.S.C. § 2674, Plaintiff is not entitled to an award of punitive damages against the United States of America. Though, Plaintiff should recover his taxable costs from the Defendant. Plaintiffs are instructed to file a motion for costs within 15 days of entry of judgment. And while the United States is not liable for prejudgment interest, *see* 28 U.S.C.

§ 2674, the Court orders post-judgment interest from the date of filing of the transcript of the judgment with the Secretary of the Treasury through the day before the date of the mandate of affirmance. 13 U.S.C. § 1304(b)(1). Finally, Plaintiff's attorneys' fees are limited to 25% of the judgment and the Court finds that to be reasonable fees in this case. *See* 28 U.S.C. § 2678.

Any finding of fact that may also be deemed a conclusion of law is so deemed. Any conclusion of law that may also be deemed a finding of fact is so deemed. The Clerk of the Court is instructed to enter a judgment in favor of the Plaintiff and against the Defendant consistent with these findings.

Respectfully Submitted,

/s/ Jamal Alsaffar
JAMAL K. ALSAFFAR
jalsaffar@nationaltriallaw.com
Texas State Bar #24027193
TOM JACOB
tjacob@nationaltriallaw.com
Texas State Bar #24069981
Whitehurst, Harkness, Brees, Cheng,
Alsaffar, Higginbotham, & Jacob PLLC
7500 Rialto Blvd, Bldg Two, Ste 250
Austin, TX 78735
(512) 476-4346 (o)
(512) 467-4400 (f)

HENRY MOORE
henry@moorelegal.net
Texas State Bar #14341500
Law Offices of Henry Moore
1101 E. 11th St.
Austin, Texas 78702-1908
(512) 477-1663 (o)
(512) 476-6212 (f)

Attorneys for the Plaintiff

## CERTIFICATE OF SERVICE

By my signature above, I certify that a copy of Plaintiff's Proposed Findings of Fact & Conclusions of Law has been sent to the following on October 18, 2019 via the Court's CM/ECF notice system.

JAMES F. GILLIGAN
JAMES E. DINGIVAN
Assistant United States Attorneys
Western District of Texas
601 N.W. Loop 410, Suite 600
San Antonio, TX 78216-5597
Tel. (210) 384-7345
Fax (210) 384-7312
jim.gilligan@usdoj.gov