IN THE UNITED STATES DISTRICT COURT FOR
THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | |
|---|---|
| **JEROME SCHMIDT**<br><br>Plaintiff<br><br>vs.<br><br>**UNITED STATES OF AMERICA**,<br><br>Defendant | **NO. 1:18-CV-88-DAE** |

# PLAINTIFF'S DEPOSITION CLIPS

Pursuant to the Court and Court clerk's instructions on Feb 27, 2020, Plaintiff files the following deposition transcripts of the deposition videos that Plaintiff used in trial. Plaintiff has attached the deposition transcript excerpts as exhibits to this pleading.

| TRIAL TRANSCRIPT REFERENCE | DEPOSITION PAGE & LINE | DEPOSITION TEXT |
|---|---|---|
| 2/10/20, 178:16–23 | Jerry Schmidt pg. 91:19 – pg. 92:8. | Q. Did you -- I asked you before we broke about a number of medical providers that you saw after the accident; true? Do you remember? <br><br>**A. No.** <br><br>Q. Do you remember -- Do you remember -- okay -- do you remember me "ask" -- <br><br>**A. That's what I'm talking about.** <br><br>Q. Do you remember me asking you questions that -- about medical providers you saw after the accident? <br><br>**A. No.** <br><br>Q. I understand. I have here a copy of the original complaint. <br><br>**A. I'm sorry. I—I wish I did. I wish I remembered.** |

| | | |
|---|---|---|
| 2/10/20, 186:9–13 | Jerry Schmidt pg. 64:5–64:20 | Q.   Do you monitor your blood pressure every day?<br><br>A.   **Two or three times a day.**<br><br>Q.   All right. And what is the range that you try keep it in? Do you know?<br><br>A.   **Yeah, I know.**<br><br>Q.   Do you want to take a break?<br><br>A.   **No. I want to do this. I want to do it. It's within normal limits or not. I can't remember what those are. I'm sorry.**<br><br>Q.   Yes, sir. Moving to the -- to the day of the accident -- Are you sure you don't want to take a break?<br><br>A.   **Just for a second.**<br><br>MR. GILLIGAN: Very good.<br>VIDEOGRAPHER: It is 12:06, and we're off the record. |
| 2/11/20, 295:5–8 | Loftus 142:2–18 | Q.   Dr. Lewine says that when he looked at the imaging between 2015 and 2018, he saw |

| TRIAL TRANSCRIPT REFERENCE | DEPOSITION PAGE & LINE | DEPOSITION TEXT |
|---|---|---|
| | | approximately 22 percent loss of brain volume. Did you agree with that?<br><br>A.  Well, I mean, you know, there's no dispute here, sir, that I think there's something bad going on in this gentleman's brain. The only question is, you know, why is it happening. So, I could say, yeah, I agree with these things you're telling me, sure. I mean, his brain is disappearing for some reasons.<br><br>Q.  Okay. And that's over a two-year period, right?<br><br>A.  Two or three, right, 2015-2018. |

| TRIAL TRANSCRIPT REFERENCE | DEPOSITION PAGE & LINE | DEPOSITION TEXT |
|---|---|---|
| 2/12/20, 463:7–9 | Jerry Schmidt pg. 77:12–20 | Q.   After the accident, was your back or any other part of your body bothering you?<br><br>**A.   I don't remember. But it was the next -- you know, a day -- I think -- I'm just reasoning here. I'm thinking I was just in shock at that time.**<br><br>Q.   Yes, sir.<br><br>**A.   It was like -- You know, I thought it was like -- and I've told people this -- it was like getting hit by Muhammad Ali.** |

| | | |
|---|---|---|
| 2/12/20, 469:2-8 | Jim Schmidt pg. 62:6-63:19 | Q. You had talked about some of the -- since the accident you were very hesitant to drive with your brother because you think it's more dangerous, I believe.<br><br>**A. Yeah.**<br><br>Q. Is that -- first of all, is that correct?<br><br>**A. I -- as I gave the evidence, you know, he sees a sign, right -- right lane ending and so he gets in the right lane; and he sees a speed limit sign change down and he doesn't change his speed limit. He doesn't get off the expressway when I tell him to get off and if I tell him to stay on -- if I tell him to don't get off the expressway, he gets off. You know, just --**<br><br>Q. Does he have -- based on your personal knowledge and interaction with him, does he have problems with concentration, attention in those situations?<br><br>**A. I -- all I can tell you is the evidence that I saw. I can't tell you whether he's concentrating or not. I'm not in his brain.** |

Q. Okay. When you're talking about driving?

**A. Yeah.**

Q. Okay. So you would tell him specifically don't get in this lane or get off at this exit and he would do --

**A. Well, we both -- Q. -- he wouldn't --
A. -- see the --**

Q. -- follow?

**A. -- sign, "Right lane ends" so he starts moving in before I see it. I didn't tell him. He just starts going into the right lane. "Jerry, that lane is ending."**

Q. Uh-huh. Did he do that before the accident?

**A. No.**

Q. Did you ever have any worries about him driving or being with him in a car before the accident?

| TRIAL TRANSCRIPT REFERENCE | DEPOSITION PAGE & LINE | DEPOSITION TEXT |
|---|---|---|
| | | A. No. Actually, he took my hot rod Corvette on a couple of trips and had no trouble. |
| 2/13/20, 675:9-14 | Watson pg. 21:14-19 | Q. And when you say you're not making any determinations about his specific injury, what do you mean by that?<br><br>**A. I'm not saying that he is or is not injured, that he has or does not have any, you know, specific type of injury.** |
| 2/13/20, 676:4-6 | Watson pg. 36:16-21 | Q. And I appreciate that. What I mean is, in doing your analysis, did you do any work or analysis as an expert witness to determine whether the crash that we're all here today about, on October 13th, 2015, caused Doctor Schmidt's cognitive issues?<br><br>**A. No.** |

| TRIAL TRANSCRIPT REFERENCE | DEPOSITION PAGE & LINE | DEPOSITION TEXT |
|---|---|---|
| 2/13/20, 676:8–11 | Watson pg. 69:9-13 | Q. What I mean by that is, you know, risk of injury doesn't tell you anything about whether Doctor Schmidt was actually injured, had a mild traumatic brain injury. Right?<br><br>A. Right. |
| 2/13/20, 677:11-15 | Watson pg. 95:19-96:1 | Q. And that wasn't really my question. My question was, to a reasonable degree of biomechanical and accident reconstruction certainty, you cannot tie the low risk of injury in this wreck to whether Doctor Schmidt actually had a resulting injury, can you?<br><br>A. **No, because I'm not opining on whether or not he has an injury.** |
| 2/13/20, 678:16–18 | Watson pg. 119:9–13 | Q. And you did not look at more probable alternative explanations to determine -- to rule in or rule out a head injury in Doctor Schmidt's case. Right?<br><br>A. **That's correct.** |

| TRIAL TRANSCRIPT REFERENCE | DEPOSITION PAGE & LINE | DEPOSITION TEXT |
|---|---|---|
| 2/13/20, 755:5–9 | Chalela pg. 78:9–13 | Q. Are you able to conclude to a reasonable degree of certainty that white matter changes are the cause of Dr. Schmidt's brain atrophy?<br><br>**A. I cannot conclude that.** |
| 2/13/20, 762:23–763:1 | Chalela pg. 96:14–21 | Q. So Exhibit 13 says: With time it was observed that greater than 90% of concussions did not have a period of loss of consciousness and that the presence or duration did not correlate with ·injury severity. Did I read that correctly?<br><br>**A. Yes.**<br><br>Q. Do you agree with that?<br><br>**A. I agree with that.** |
| 2/13/20, 768:2–4 | Chalela pg. 76:24–77:2 | Q. And he's saying that he agrees that between 2015 and 2018 the films for Dr. Schmidt are beyond expectations for normal aging.<br><br>**A. I would agree with that.** |

| TRIAL TRANSCRIPT REFERENCE | DEPOSITION PAGE & LINE | DEPOSITION TEXT |
|---|---|---|
| 2/13/20, 768:17–19 | Chalela pg. 77:3-6 | Q. Do you agree that the films between 2015 and 2018 for Dr. Schmidt's brain atrophy are beyond expectations for normal aging?<br><br>**A. For a normal individual, yes.** |
| 2/14/20, 853:24–854:3 | Loftus pg. 162:11-18 | Q. Doctor, you're not diagnosing Dr. Schmidt with dementia, are you?<br><br>**A. Well, I've read his deposition. I think he's pretty demented.**<br><br>Q. Is that a clinical diagnosis you're providing Dr. -- for Dr. Schmidt?<br><br>**A. No, I'm not qualified to do that.** |

| TRIAL TRANSCRIPT REFERENCE | DEPOSITION PAGE & LINE | DEPOSITION TEXT |
|---|---|---|
| 2/25/20, 1053:21-1054:1 | Burns pg. 54:4-14 | Q. Okay. How long was your conversation with Dr. Boone on the same day?<br><br>**A. Probably about the same. I don't know, I never billed for that. Hmm. So – but probably, you know, 15, 20 minutes.**<br><br>Q. Okay. And both of those conversations took place on the same day; right?<br><br>**A. Yes.**<br><br>Q. And then on the same day, you gave your report – your first report; correct?<br><br>**A. Yes.** |

| TRIAL TRANSCRIPT REFERENCE | DEPOSITION PAGE & LINE | DEPOSITION TEXT |
|---|---|---|
| 2/25/20 1061:5-8 | Burns pg. 110:14-22 | Q.   And Dr. Thoma, in addition to doing his own testing, reviewed the other testing that was actually done by the treating neuropsychologist as well.  You understand that; correct?<br><br>**A.   Well, you're telling me that.  I don't remember whether he did that or not.**<br><br>Q.   Okay.  Did you read his deposition? Dr. Thoma's deposition?<br><br>**A.   No.  I did not get to that one.** |
| 2/27/20, 1287:16–19 | Boone pg. 138:1–4 | Q.   Okay. Were you informed that Dr. Schmidt's brother was also deposed in this case?<br><br>**A.   No.** |
| 2/27/20, 1296:9–11 | Boone pg. 206:11–17 | Q.   Okay. So, what I'm understanding is that you have not set up any kind of business structure that would allow you to receive patients even if a neurologist wanted you to do a clinical treatment?<br><br>**A.   Right. I'm not on insurance panels. I don't have the mechanism to do that.** |

| TRIAL TRANSCRIPT REFERENCE | DEPOSITION PAGE & LINE | DEPOSITION TEXT |
|---|---|---|
| 2/27/20, 1299:21-23 | Boone pg. 170:12-20 | Q. Okay. How many of these tests did Dr. Dees run for his patient, Dr. Schmidt, that are listed in your letter; do you know?<br><br>**A. Well, I'd have to compare them side by side.**<br><br>Q. Okay. Go ahead.<br><br>**A. So you want me to do that?**<br><br>Q. Yes, I do.<br><br>**A. Ten. Ten.** |

| TRIAL TRANSCRIPT REFERENCE | DEPOSITION PAGE & LINE | DEPOSITION TEXT |
|---|---|---|
| 2/27/20, 1300:6–8 | Boone pg. 172:1–10 | Q. And so just for the record, on the first test that Dr. Dees the treating neuro-psych performed, he did ten of the tests that you recommend in your sample letter in your book; correct?<br><br>**A. Correct.**<br><br>Q. And then the second exam he did 11 of the tests that you recommend in your sample book; correct?<br><br>**A. Correct.** |

Respectfully Submitted,

/s/ Jamal Alsaffar
JAMAL K. ALSAFFAR
jalsaffar@nationaltriallaw.com
Texas State Bar #24027193
TOM JACOB
tjacob@nationaltriallaw.com
Texas State Bar #24069981
Whitehurst, Harkness, Brees, Cheng,
Alsaffar, Higginbotham, & Jacob PLLC
7500 Rialto Blvd, Bldg Two, Ste 250
Austin, TX 78735
(512) 476-4346 (o)
(512) 467-4400 (f)

HENRY MOORE
henry@moorelegal.net
Texas State Bar #14341500
Law Offices of Henry Moore
1101 E. 11th St.
Austin, Texas 78702-1908
(512) 477-1663 (o)
(512) 476-6212 (f)

Attorneys for the Plaintiff

## CERTIFICATE OF SERVICE

By my signature above, I certify that a copy of Plaintiff's Deposition Clips has been sent to the following on March 5, 2020 via the Court's CM/ECF notice system.

JAMES F. GILLIGAN
JAMES E. DINGIVAN
KRISTINA S. BAEHR
Assistant United States Attorneys
Western District of Texas
601 N.W. Loop 410, Suite 600
San Antonio, TX 78216-5597
Tel. (210) 384-7345
Fax (210) 384-7312
jim.gilligan@usdoj.gov
kristina.baehr@usdoj.gov
james.dingivan@usdoj.gov