IN THE UNITED STATES DISTRICT FOR
THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

**JEROME SCHMIDT**                              NO. 1:18-CV-88-DAE

    Plaintiff

vs.

**UNITED STATES OF AMERICA**,

    Defendant

# PLAINTIFF'S PROPOSED FINDINGS OF FACT & CONCLUSIONS OF LAW

"Traumatic brain injuries are invisible, and people can hide them. And when you've got an invisible injury, you get invisible compassion."[1] On October 13, 2015, Plaintiff Jerry Schmidt was hit by a vehicle driven by an employee of the United States. Since the wreck, "Jerry is not Jerry anymore."[2]

In the Court's view, this case closely resembles *Rufo v. United States*, a recent FTCA judgment against the Government.[3] There, a DEA agent caused a wreck resulting a Plaintiff's mild traumatic brain damage. *Id.* at *1. Like Dr. Schmidt, the wreck caused a coup/counter-coup motion, and Rufo was dazed. *Id.* Rufo went to the hospital, but imaging of his brain showed no

---

[1]    Tr.at 521:8-17 (Dr. Dobyns).

[2]    *Id.* at 518:18.

[3]    No. 18-2138, 2020 WL 968973 (C.D. Cal. Feb. 28, 2020).

abnormalities. *Id.* But in the weeks following the wreck, Rufo started to develop dizziness, visual problems, and cognitive deficits. *Id.* Incidentally, four months after the wreck, Rufo's mother passed away. *Id.* Given Mr. Rufo's presentation, his treating doctor diagnosed him with post-concussion syndrome. *Id.* At trial, the Government argued that Rufo had preexisting conditions including depression stemming from the loss of his job and his mother, hypertension, sleep apnea, diabetes, and obesity. *Id.* at *3. Dismissing the Government's arguments, the court awarded $4,099,581.80 in damages, including $2,000,000 in non-economic damages. *Id.* at *5.

In this case, the Court granted summary judgment on liability,[4] and the Court tried the remaining issue of damages in February 2020. At the Government's request, the Court heard additional evidence on July 21, 2020. Under Rule 52(a)(1), this Court issues its findings of fact and conclusions of law in this action.

The Court reviewed the record and the evidence presented at trial and the arguments of the parties. The Court has made determinations as to the relevancy and materiality of the evidence, assessed the credibility of the witnesses, and ascertained for its purposes the probative value of the evidence. After such consideration, the Court finds the following facts to have been proved by a preponderance of the evidence, and after applying the applicable law to such facts, makes the following conclusions of law.

---

[4]   Dkt. No. 65 (Order Grant. Pl.'s Mot. Partial Summary J.).

# TABLE OF CONTENTS

Preliminary Findings ........................................................................................ 5

   1.  Parties & Witnesses ............................................................... 5

   2.  Jurisdiction & Venue ............................................................. 6

   3.  Agency ...................................................................................... 7

The Wreck ......................................................................................................... 8

The First Forty-Eight (48) Hours ............................................................... 11

   1.  When must the symptoms first appear? ............................ 11

   2.  What symptoms of brain damage did Jerry Schmidt show? ............... 12

Objective Testing Proves Brain Damage ................................................... 14

   1.  Neuropsychological Testing ................................................. 15

      1.1.  Neuropsychological testing is objective, reliable evidence ........ 15

      1.2.  Treating doctors concluded the wreck caused brain damage ...... 17

      1.3.  Plaintiff's expert testing revealed the extent of the brain damage and its cause ...... 18

   2.  Sequential brain MRIs show the damage process ............... 21

   3.  MEG & EEG Testing. ........................................................... 25

Pre-existing Risk Factors for Injury ......................................................... 30

   1.  Secondary Cascade Traumatic Damage Process ............... 31

   2.  Fact-Witness testimony confirms Plaintiff's experts' conclusions. ...... 34

Causation ........................................................................................................ 36

   1.  The Government caused brain damage to Jerry Schmidt ........ 37

   2.  The lone VA record does not break the causal chain ............ 39

Alternative Possible Causes ......................................................................... 40

1. Organic Dementias ................................................ 41
   1.1. No organic dementia caused Plaintiff's harm ............. 41
   1.2. Traumatic brain damage actually causes dementia ........ 44

2. Hypertension .................................................... 45

3. Jerry Schmidt's son's death .................................... 46

4. Natural Aging .................................................. 48

5. Lying, Faking, or Malingering ................................. 49

6. Did the Vietnam War cause brain damage 41 years later? ........ 52

Economic Damages ................................................... 54

1. Future Medical Expenses ........................................ 54
   1.1. Method & Opinions .......................................... 55
   1.2. Life care plan components ................................. 56
   1.3. The Government's life care plan ........................... 59
   1.4. Orthopedic Injuries ....................................... 60

2. Life Expectancy ................................................ 62

3. Present Value of Future Economic Damages & Lost
   Earnings ....................................................... 64

Non-Economic Harm .................................................. 67

Texas Law on Damages ............................................... 69

1. Similar Verdicts ............................................... 69

2. Jerry Schmidt's Economic & Non-Economic Losses ................ 71

Conclusions of Law ................................................. 73

## PRELIMINARY FINDINGS

1.   ***Parties & Witnesses***

Plaintiff, Dr. Jerome Schmidt, is a veteran of the United States Army and was honorably discharged at the rank of 1st Lieutenant, Armor (A Co. 1/69 Armor, 4th Infantry Division).[5] In the military, Dr. Schmidt served as a tank platoon leader during the Vietnam War, eventually being promoted to Scout Platoon Leader.[6] For his conduct in the war, the Government awarded him a Bronze Star, with "V" for valor.[7]

After his honorable discharge, Dr. Schmidt trained as a psychologist, with a specific focus in helping veterans.[8] First, he received his bachelor's degree in psychology from Trinity University.[9] Then he earned his doctoral degree from Louisiana State University in psychology.[10] He then practiced general psychology for over thirty years.[11] At the time of the wreck, Dr. Schmidt worked part time in private practice.[12]

The Defendant in this case is the United States of America.

---

[5]   Tr. at 1136:6 (Jerry Schmidt). *See also* Dkt. No. 74, at #4 (Stipulations). References to the trial transcripts in this document will cite the specific numbered pages from the trial in the daily transcripts (pages 1 to 1330). To the extent that the re-examination of Dr. Chalela is cited, Plaintiff will cite to those pages (1 to 70) and denote the date of the examination, July 21, 2020.

[6]   Tr. at 1136:1 (Jerry Schmidt).

[7]   *Id.* at 1138:11.

[8]   *Id.* at 1139:5-25.

[9]   *Id.* at 1135:7-8.

[10]   *Id.* at 1138:20-23.

[11]   *Id.* at 1139:2.

[12]   Tr. at 1013:2 (Margot Burns).

Plaintiff called the following experts: Dr. Erin Bigler, Dr. Jeffrey Lewine, Dr. Robert Thoma, Dr. Travis Snyder, Dr. Wayne Dees, Dr. Christine Vidouria, Dr. John Swiger, and Dr. Michael Freeman. The Court finds these witnesses well qualified through skill, education, experience, knowledge, and training in their respective areas of expertise and finds that these witnesses provided credible and reliable testimony.

## 2. *Jurisdiction & Venue*

The substantive law of the State of Texas applies to this lawsuit as the acts or omissions complained of in this lawsuit occurred in Austin, Texas.[13] 28 U.S.C. § 1346(b)(1).

The United States District Court for the Western District of Texas has jurisdiction over this case under 28 U.S.C. §§ 1346(b), 2401, and 2671–80.

Venue is proper in this district pursuant to 28 U.S.C. § 1402(b) because the United States is a defendant and Plaintiff resides in this district.[14] Additionally, venue is proper because a substantial part of the events or omissions giving rise to the claim occurred in this District.[15]

The United States received notice of the claim underlying this lawsuit when Plaintiff presented these claims administratively to the Department of the Navy on August 14, 2017. Plaintiff's Standard Form 95 contained a "sum

---

[13]   Dkt. No. 74, at #9 (Stipulations).

[14]   *Id.* at #2.

[15]   Dkt. No. 8, at 2 ¶ 6 (Gov't. Answer).

certain" in the amount of $8,000,000 as required under 28 U.S.C. § 2675(b).[16] The Government finally denied Plaintiff's claim on December 13, 2017.[17] Plaintiff filed this lawsuit within six (6) months of the final denial.[18] Accordingly, Plaintiffs have complied with all jurisdictional prerequisites and conditions precedent to the commencement and prosecution of this suit.[19]

Plaintiff properly served the United States, and it has properly appeared in this suit.[20] This lawsuit was filed within the statute of limitations.[21]

### 3. *Agency*

The remedy against the United States under the Federal Tort Claims Act is exclusive with regard to claims based upon torts of federal employees within the scope of their employment. 28 U.S.C. § 2679. No exception listed in 28 U.S.C. § 2680 to the Federal Tort Claims Act bars this lawsuit.[22]

The United States Department of the Navy is an agency of the United States of America.[23] The Defendant, United States of America, through its agency, the United States Department of the Navy, at all times material to this action, employed Edward R. Saylor, the driver of the other vehicle

---

[16]   Pl. Exh. 13, at 5 ¶ 2 (Def. Resp. Request for Admissions).

[17]   Dkt. No. 74, at #5 (Stipulations).

[18]   *Id.*

[19]   Dkt. No. 8, at 2 ¶ 10 (Gov't. Answer); *see also* Pl. Exh. 13, at 5 ¶ 1 (Def. Resp. Request for Admissions).

[20]   Dkt. No. 74, at #6 (Stipulations).

[21]   *Id.* at #7.

[22]   *Id.* at #8.

[23]   *Id.* at #3.

involved in the wreck.[24] Mr. Saylor was, in October 2015, an active duty member of the United States Marine Corps.[25] At all times material to this action, USMC Saylor was an agent, servant, or employee of the United States of America acting within the course and scope of his employment.[26]

## THE WRECK

On October 13, 2015, USMC Edward Saylor drove a Navy cargo van southbound on South Lamar Blvd., in Austin, Texas at approximately 2:00pm.[27] At the intersection of Lamar & Manchaca, he attempted an unprotected left turn and collided head-on into a maroon Toyota 4-runner, which was driven by Dr. Schmidt.[28]

Dr. Schmidt wore his seat belt, but the 40-mile-per-hour collision caused his airbags to explode.[29] Dr. Schmidt's head hit the airbag, and then bounced back, in what's known as a coup-contrecoup motion.[30]

The wreck totaled Dr. Schmidt's Toyota 4-runner, causing primary damage to the front of the vehicle.[31] After interviewing the witnesses and the

---

[24]   *Id.*

[25]   *Id.*

[26]   *Id.*

[27]   Tr. at 589:11-18 (Sgt. Edward Saylor).

[28]   Dkts. ## 45 at 2; 49 at 2; 65 at 2.

[29]   Dkt. No. 74, at #13 (Stipulations).

[30]   Pl. Exh. 1, at 1 (ER Triage Note); 9 (follow-up note from the day following wreck).

[31]   Dkt. No. 74, at #14 (Stipulations).

parties, the Austin Police Department cited Saylor for failure to yield.[32] The wreck totaled Dr. Schmidt's vehicle.[33]

Right after clearing the wreck, Dr. Schmidt checked himself into the Seton Emergency Room.[34] Dr. Schmidt's chief complaint was neck pain and pain throughout the left side of his body.[35] Dr. Schmidt's complaint of neck pain evidences the forces involved in the wreck and their effect on his head.[36]

At 5:27pm, Seton ER doctors took a non-contrast head CT, which a radiologist interpreted as "Normal non-contrast CT head for age."[37] The fact that providers took a CT, at minimum, indicates concern for a traumatic brain injury.[38] Given the radiation dose, the ER physicians would not have ordered a CT if there was no concern for head trauma.[39]

Providers noted that Dr. Schmidt needed an MRI, so they sent Dr. Schmidt to Breckenridge Emergency Room.[40] But after waiting at

---

[32]  *Id.* at #15.

[33]  *Id.* at #14. *See also* Pl. Exh. 4.

[34]  Pl. Exh. 1, at 1; Tr. at 43:14–16 (July 21, 2020) (Dr. Chalela).

[35]  *Id.*

[36]  Tr. at 44:21–25 (July 21, 2020) (Dr. Chalela).

[37]  *Id.*

[38]  Tr. at 46:15–48:1 (Dr. Snyder).

[39]  *Id.* at 47:9–48:1.

[40]  Pl. Exh. 1, at 4-7.

Breckenridge ER until nearly midnight, Dr. Schmidt asked to be discharged and to follow up with his primary care doctor.[41]

Similarly, the fact that ER providers wanted an MRI even after a normal CT evidences the fact that they continued to have concerns for traumatic brain damage. In fact, there was universal agreement between Plaintiff's experts and Government experts that neither a normal CT[42] nor a normal MRI[43] rules out traumatic brain damage.[44]

Before giving Jerry Schmidt the CT, and before recommending the MRI, providers also determined that Dr. Schmidt's Glasgow Coma Score (GCS) was a 15. The Government tried to use this as evidence that Dr. Schmidt suffered no injury from the wreck. The Government's position is inconsistent with the treating doctors scanned Jerry Schmidt's brain for trauma even after scoring him on the Glasgow Coma Scale. Even more, both Plaintiff's experts and Government experts agreed that GCS evidence—which indicated

---

[41] *Id.* at 6-7; 12 ("Prior work-up has included evaluation at the SSW emergency room, who then transferred him to UMCB for MRI. [Jerry Schmidt] waited for hours and ultimately left without getting the MRI.").

[42] A normal CT does not rule out traumatic brain damage. Tr. at 48:15–21 (Dr. Snyder); Tr. at 139:20–24 (Dr. Dees); Tr. at 197:8–10 (Dr. Thoma); Tr. at 241:1–7 (Dr. Lewine); Tr. at 767:1–3 (Dr. Chalela); Tr. at 919:21–23 (Dr. Loftus).

[43] A normal MRI does not rule out traumatic brain damage. Tr. at 58:3–5 (Dr. Snyder); Tr. at 140:3–6 (Dr. Dees); Tr. at 197:8–10 (Dr. Thoma); Tr. at 241:8–11 (Dr. Lewine); Tr. at 767:4–6 (Dr. Chalela); Tr. at 920:3–6 (Dr. Loftus).

[44] In fact, Plaintiff's neuroradiologist, Dr. Snyder, explained that the findings for traumatic brain damage often fall below the resolution of an MRI. Tr. at 58:6–25 (Dr. Snyder). In fact, MRI shows abnormalities in mild traumatic brain damage cases in less than 20 percent of the time. Tr. at 241:17–22 (Dr. Lewine).

that Dr. Schmidt was not in a coma after the wreck—does not rule out traumatic brain damage.[45]

## THE FIRST FORTY-EIGHT (48) HOURS

Within 48 hours following the wreck, experts from both sides agreed that Jerry Schmidt displayed a "constellation of symptoms" attributable to traumatic brain damage.[46]

1. ***When must the symptoms first appear?***

The Government argued that because Jerry Schmidt did not have symptoms on the day of the wreck, the Government caused no injury.

First, the Government starts from an incorrect premise: Dr. Schmidt *did* show symptoms attributable to brain damage on the day of the wreck. The Government's own driver, Sgt. Saylor, testified that the wreck shook up Jerry Schmidt and left him in shock.[47] And Dr. Schmidt called his brother who testified that Dr. Schmidt sounded lethargic shortly after the wreck.[48] Defense witnesses agreed that lethargy may result from traumatic brain damage.[49] In fact, Dr. Loftus and his sponsored literature described lethargy

---

[45]   *E.g.*, Tr. at 946:15–947:3 (Dr. Vidouria); Tr. at 919:24–920:2 (Dr. Loftus).

[46]   Tr. at 917:10–14 (Dr. Loftus); Tr. at 55:24–56:2 (Dr. Snyder).

[47]   Tr. at 594:5–8 (Sgt. Edward Saylor).

[48]   Tr. at 557:5–8 (James Schmidt).

[49]   Tr. at 46:17–20 (July 21, 2020) (Dr. Chalela); Tr. at 917:2–4 (Dr. Loftus).

on the day of the wreck as an "alter[ation] of consciousness" that followed traumatic brain damage.[50]

Second, the literature shows that neurologic deficits first appear anywhere from three to thirty days after the primary injury.[51] Moreover, Defense expert Dr. Chalela conceded that the absence of symptoms at the time of ER examination does not rule out traumatic brain damage.[52] In fact, Dr. Loftus' book states that delayed symptoms are an independent risk factor for permanent brain damage following a concussion.[53]

### 2. *What symptoms of brain damage did Jerry Schmidt show?*

On October 14, the day after the wreck, Dr. Schmidt presented to Dr. Kenneth Bunch.[54] Dr. Schmidt stated that he was there for an "urgent visit

---

[50]   Tr. at 917:5–9 (Dr. Loftus).

[51]   Tr. at 86:23–87:10 (Dr. Snyder) (Pl. Exh. 57, Himamen article criteria is 3 days post primary injury); Tr. at 465:17–21 (Pl. Exh. 130, VA Guidelines on TBI).

[52]   Tr. at 46:25–47:13 (July 21, 2020) (Dr. Chalela); *see also* Tr. at 47:22–78:7 (discussing the American Congress of Rehabilitation Medicine's definition of TBI, which states, "Some patients may not become aware of, or admit, the extent of their symptoms until they attempt to return to normal functioning." Pl. Exh. 47, at 2).

[53]   Tr. at 910:6–7 (book quote); 917:10–14 (confirming applicability to Jerry Schmidt); 917:5–9 ("altered consciousness on the day of the accident").

[54]   Without any evidence, the Government contended at trial that Dr. Schmidt's appointments with Dr. Bunch and Dr. Raymond within the first 48-hours following the wreck were pre-existing appointments made by the VA. The Government goes so far as to make this contention while admitting that there's no "document[ation] that shows that [Dr. Schmidt] was referred." Tr. at 52:11–14 (July 21, 2020) (Dr. Chalela). Not only does the Government lack evidence, their contention directly contradicts the documentary evidence: intake forms from both Dr. Bunch and Dr. Raymond both show that the visits were self-referrals. Pl. Exh. 151B, at 12 (Dr. Bunch); Pl. Exh. 150, at 46 (Dr. Raymond). Indeed, the

[secondary] to an MVA." As described in Dr. Bunch's records, within 24 hours of the wreck, Jerry Schmidt developed headaches and mental fogginess.[55]

The next day, on October 15, 2015, Dr. Schmidt presented to Dr. Andrea Raymond, a neurologist. Within 48 hours of the wreck, he describes symptoms of "weepiness," persistent sleep disturbance, memory and cognitive issues. He also started experiencing blurred vision, even with the use of his prescription glasses. He also reported dizziness and headaches, feelings of stress, and difficulty concentrating. In the day's following the wreck, Dr. Schmidt noticed that he was not able to complete his work with the speed or thoroughness he had prior to the wreck.[56]

Experts across the aisle agreed that TBI causes the same signs or symptoms Plaintiff reported: persistent headache,[57] mental fogginess,[58] sleep disturbance,[59] memory issues,[60] fatigue,[61] blurred vision despite use of

---

Bunch visit the day after the wreck was noted as an "urgent" follow up to the wreck. Pl. Exh. 1, at 9. Unfortunately, this is not the last time the Government speculates—without evidence—on pre-existing issues.

[55] Pl. Exh. 1, at 9 (Oct. 14, 2015) (Dr. Bunch); Tr. at 49:6–11 (July 21, 2020) (Dr. Chalela testifies that both may be caused by TBI).

[56] Tr. at 1140:9-16 (Jerry Schmidt); Pl. Exh. 1, at 12 ("He did work yesterday, felt he was slower than normal.").

[57] Tr. at 53:1–3 (Dr. Snyder); 878:10-11 (Dr. Loftus); 699:17 (Dr. Chalela).

[58] Tr. at 53:1–3 (Dr. Snyder); 878:11 (Dr. Loftus); 699:17 (Dr. Chalela).

[59] Tr. at 54:5–7, 54:19–21 (Dr. Snyder); 942:2 (Dr. Vidouria).

[60] Tr. at 54:5–7 (Dr. Snyder); 279:18-22 (Dr. Lewine); 942:3 (Dr. Vidouria); 454:23 (Dr. Bigler); 140:23 (Dr. Dees).

[61] Tr. at 54:5–7 (Dr. Snyder); 916:24-917:4 (Dr. Loftus); 942:3 (Dr Vidouria).

glasses,[62] dizziness,[63] difficulty concentrating,[64] altered consciousness,[65] and stress.[66]

After an examination, Dr. Raymond diagnosed Dr. Schmidt with post-concussive syndrome and ordered an MRI of his brain for the same reasons the ER providers wanted one.[67] And if the symptoms persisted, she wanted him to undergo a formal neuropsychological evaluation.[68]

## OBJECTIVE TESTING PROVES BRAIN DAMAGE

On October 22, 2015, radiologists at Austin Radiological Association took an MRI of Dr. Schmidt's brain.[69] They compared it to an MRI taken of his brain in 2013 but did not find any significant changes.

On October 30, 2015, Jerry Schmidt again presented to Dr. Raymond.[70] She noted Dr. Schmidt suffered from memory loss, cognitive slowing, and anxiety in the three weeks following the wreck. She gave Dr. Schmidt a basic neuropsychological test known as the Montreal Cognitive Assessment. It

---

[62]   Tr. at 54:10–14 (Dr. Snyder); 699:18 (Dr. Chalela); 455:1 (Dr. Bigler).

[63]   Tr. at 54:15–18 (Dr. Snyder); 699:18-19 (Dr. Chalela); 455:1 (Dr. Bigler).

[64]   Tr. at 54:19–21 (Dr. Snyder); 296:9 (Dr. Lewine); 699:18 (Dr. Chalela); 454:24 (Dr. Bigler); 140:23-24 (Dr. Dees).

[65]   Tr. at 917:5-7 (Dr. Loftus).

[66]   Tr. at 54:19–21 (Dr. Snyder); 878:12 (Dr. Loftus).

[67]   Pl. Exh. 1, at 14.

[68]   *Id.*

[69]   *Id.* at 16.

[70]   *Id.* at 17-18.

showed delayed recall and verbal difficulties.[71] Concerned for persistent neurocognitive difficulties, Dr. Raymond referred Dr. Schmidt to the Austin Center for Therapy & Assessment for formal and comprehensive neuropsychological testing.[72]

## 1. *Neuropsychological Testing*

Dr. Raymond ultimately refers Jerry Schmidt to Dr. Wayne Dees three times. First, she refers him for the initial battery of neuropsychological testing.[73] After receiving the results of this test, she refers him again for a year of cognitive rehabilitation.[74] And then a third time, she refers him for re-evaluation by Dr. Dees.[75]

### 1.1. **Neuropsychological testing is objective, reliable evidence**

The Court finds that neuropsychological testing provides objective, reliable evidence of brain damage and its causes. Neuropsychologists administer a battery of tests on their patients to assess cognitive abilities, including academic skills, intellectual function, attention, concentration, memory, fine motor skills, and language functions.[76] Neuropsychologists research and validate the tests administered on their patients. Dr. Dees

---

[71]   *Id.*

[72]   *Id.*

[73]   Pl. Exh. 1, at 20.

[74]   Pl. Exh. 150, at 28 (Dec. 10, 2015).

[75]   Pl. Exh. 1, at 56.

[76]   Tr. at 138:10:23 (Dr. Dees).

testified that the field considers these tests the "gold standard."[77] Even the Defendant's literature reveals neuropsychological testing is "high[ly] sensitive and specific for detection of dementia."[78] Importantly, that same literature states that causal determinations are more reliable when there are—like in this case—multiple, sequential neuropsychological tests performed.[79]

Moreover, Dr. Schmidt received no special advantage by virtue of his background in psychology.[80] A neuropsychologist tailors the specific battery to the patient's specific presenting problem.[81] In fact, Plaintiff's expert Dr. Robert Thoma spent hours just talking to him to tailor testing to Dr. Schmidt.[82]

---

[77] Tr. at 137:24–138:7 (Dr. Thoma); 153:1–10 ("volumes and volumes of research" backs up these tests); 171:23–171:6.

[78] Tr. at 58:3–60:4 (July 21, 2020) (Dr. Chalela).

[79] *Id.* at 60:13–61:5.

[80] Neuropsychologists get specialized training and education above and beyond clinical psychologists. Tr. at 164:17–165:4 (Dr. Thoma).

[81] Tr. at 139:8–14 (Dr. Dees).

[82] Tr. at 166:10–23; see also Tr. at 186:23–187:8 (being a psychologist gives Jerry no specific advantage than any other person). Dr. Robert Thoma is a neuropsychologist and professor of neuropsychology at the University of New Mexico School of Medicine's Department of Psychiatry. He received a masters and a doctorate in Clinical Psychology from the University of New Mexico. He has over twenty years of experience in clinical psychology. Dr. Thoma also has significant experience in advanced neuro-imaging techniques. For example, he was a postdoctoral fellow in neuropsychology and neuroimaging at the Center for Advanced Medical Technologies, in the Department of Radiology at the University of Utah. And he is published and has presented hundreds of times in the area of clinical neuropsychology. Pl. Exh. 8 (Dr. Thoma CV).

### 1.2.  **Treating doctors concluded the wreck caused brain damage**

In the first set of testing, Dr. Wayne Dees subjected Jerry Schmidt to a neuropsychological battery of tests lasting two days.[83] These tests showed Dr. Schmidt's intellectual functioning fell in the superior range, with an IQ surpassing the 91st percentile. He also demonstrated highly developed abilities in the areas of math, spelling, and reading. However, the results showed a discrepancy between his intellectual and academic functioning when compared to memory and cognitive testing. Dr. Dees concluded that the results of the neuropsychological evaluation are consistent with symptoms of a Major Neurocognitive Disorder, secondary to traumatic brain damage.

Then, over the course of the next year, Dr. Raymond prescribed for Dr. Schmidt over forty-seven (47) visits to cognitive therapy.[84] However, Dr. Schmidt continued to present to his providers with issues related to his traumatic brain damage, including memory issues, anxiety, personality change, and difficulty concentrating.[85] In fact, by January 2016, Dr. Raymond wrote Jerry Schmidt a jury-excuse letter, certifying that he was "significantly impaired" due to post-concussive syndrome.[86] She believed that Jerry could not serve on a jury because of his cognitive deficits.

After the year of cognitive therapy, Dr. Raymond referred Jerry Schmidt back to Dr. Dees for yet another battery of neuropsychological tests.[87]

---

[83]  Pl. Exh. 1, at 20–32 (November 16 & 25th, 2015).

[84]  Pl. Exh. 150, at 28 (Dec. 10, 2015).

[85]  Pl. Exh. 1, at 33-70.

[86]  Pl. Exh. 150, at 74 (Jan. 29, 2016).

[87]  Pl. Exh. 1, at 56.

Specifically, Dr. Raymond referred him for this re-evaluation due to "ongoing concerns with memory, mental confusion, and concentration post motor vehicle accident, where he suffered a closed head injury."[88] The testing revealed an improvement from the immediate-post wreck testing, but also showed that Dr. Schmidt continued to exhibit neurocognitive problems secondary to the closed head injury.[89] The results were still a significant decline from Dr. Schmidt's premorbid level of functioning, given his educational and work history.[90]

### 1.3. **Plaintiff's expert testing revealed the extent of the brain damage and its cause**

Next, working in concert with Plaintiff's other neuropsychologist expert, Dr. Erin Bigler, Dr. Thoma administered a series of neuropsychological tests on Dr. Schmidt over the course of two days in 2018.[91] His test results showed that Dr. Schmidt functioned two to three standard deviations below the population average.[92] Further, Dr. Thoma concluded to a reasonable degree of medical certainty that Dr. Schmidt suffered cognitive deficits in reaction time, motor speed, sustained attention, learning and memory, and confrontation naming.[93] For example, the wreck moderately to severely

---

[88]   Pl. Exh. 1, at 65.

[89]   *Id.* at 56-69. Jerry had high average to superior premorbid testing based on the objective tests performed. Tr. at 154:18–21, 155:4–12 (Dr. Dees); Tr. at 174:10–19 (testing based on 2000 people in Jerry's age range).

[90]   Pl. Exh. 1, at 66.

[91]   Tr. at 167:3-5 (Dr. Thoma).

[92]   *Id.* at 195:13.

[93]   *Id.* at 177:22-178:1; 181:22-24; 183:3-7; 185:21-22.

impaired Jerry's memory, to the point where 99 percent of healthy people would score better than him.[94] Similarly, Jerry's attention and reaction time fell below 99 percent of healthy people. The wreck severely impaired his reaction time.[95] Fine motor control tests showed lateralized brain damage from the wreck as well.[96] As a result of the deficits fully described at trial, Plaintiff's brain damage makes it more likely he will make hazardous errors regarding self-help, self-care, home management, food and safety.[97]

---

[94] *Id.* at 175:18–176:6, 177:24–178:1; 182:8–10 (Jerry's "ability to learn and encode new information is far below where it should be.").

[95] *Id.* at 183:3–10.

[96] *Id.* 184:5–185:13.

[97] Tr. at 470:19-25 (Dr. Bigler); Tr. at 173:16–176:14; 185:14–25 (Dr. Thoma).

## CVLT-II



## CPT II



*Figure 1 The test results administered by Dr. Thoma show significant cognitive problems caused by the car wreck.*

Moreover, Dr. Thoma observed in Dr. Schmidt an intention tremor and problems with gait and balance, which suggested to him that the wreck caused injury to the pontine-cerebellar motor control system.[98] Based on the records and their examination, and to a reasonable degree of certainty, Dr. Thoma testified that his findings are consistent with a hit by an airbag and suffering a coup-contrecoup brain injury.[99]

---

[98]   Tr. at 184:5-185:13 (Dr. Thoma).

[99]   *Id.* at 196:10-16.

2.   *Sequential brain MRIs show the damage process.*

Plaintiff's neuroradiologist expert, Dr. Travis Snyder, reviewed three sets of images.[100] He reviewed an MRI of Dr. Schmidt taken pre-morbidly, in 2013. He reviewed the 2015 MRI taken almost immediately after the wreck. And he reviewed an MRI taken in 2018 as a part of this legal case. He also reviewed the medical records, neuropsychological testing results, and other objective tests such as EEG, MEG, and plain radiology. Based on this review, Dr. Snyder concluded to a reasonable degree of medical certainty that the motor vehicle wreck on October 15, 2015 caused the cognitive deficits faced by Dr. Schmidt today.[101]

The Court finds Dr. Snyder qualified and credible.[102] Notably, the only neuroradiological testimony came from Dr. Snyder. Moreover, Dr. Snyder has a research and clinical focus on traumatic brain damage. Dr. Snyder took the Court through the underlying images in a live demonstration, providing more of Jerry Schmidt's imaging than any defense expert. The Court also learned that Dr. Snyder does not personally profit from legal consulting he does for

---

[100]  Tr. at 44–60 (Dr. Snyder).

[101]  *Id.* at 45:11-15.

[102]  Dr. Travis Snyder is a board-certified radiologist with a certificate of added qualification (CAQ) in neuroradiology. Dr. Snyder graduated with a medical degree from Touro University Medical School in Las Vegas, Nevada. He has internships and residencies at Michigan State University, and the University of Miami. He is licensed to practice medicine in Michigan, Florida, Nevada, Arizona, and California. Dr. Snyder has an extensive neuroradiological clinical practice. *See* Pl. Exh. 9 (Snyder CV).

this or any other case. All money he receives as a result of his legal consulting is used to fund research into traumatic brain damage.[103]

In examining the three MRI images, Dr. Snyder confirmed that the basic sequences (FLAIR and T2) are structural and standard across MRI scanners. So, they are directly comparable. Dr. Snyder testified that he compares images in his practice—like he did in this case—twenty to thirty times a day.[104] Dr. Snyder testified that there were no clinically significant changes between the 2013 and 2015 MRIs, and his conclusion is consistent with and supported by every other radiologist that reviewed the films in this case.[105] Indeed, the treating radiologist performed the same comparison and reached the same conclusion.[106]

In contrast, the ventricles between 2015 to 2018 are "markedly bigger."[107] Since the death of brain tissue causes the ventricles to expand, ventricle enlargement in Plaintiff's brain is clinically significant.[108] Dr. Snyder testified the brain shrunk at a "very abnormal rate" between the 2015 and 2018 scans.[109] Unfortunately, ventricular enlargement is a very poor

---

[103] Tr. at 40:9-13, 41:6-21, 42:4-22 (Dr. Snyder).

[104] *Id.* at 70:11–25.

[105] *Id.* at 82:9–18; 94:13–15 (imaging shows no clinically significant difference in Dr. Schmidt's hippocampus).

[106] Pl. Exh. 1, at 16 (2015 MRI Report).

[107] Tr. at 78:9–79:6 (Dr. Snyder).

[108] *Id.* at 79:11–25.

[109] *Id.* at 80:1–14.

prognostic indicator associated with poor outcome.[110] After taking the Court from the Sylvian fissure through every slice of the 2018 images, Dr. Snyder testified that you see brain tissue death, "secondary to injury."[111]

Finally, between 2015 and 2018, the imaging shows clinically significant hippocampal atrophy.[112] On the imaging, the hippocampus shrunk and the cerebrospinal fluid space has "increased dramatically," in what Dr. Snyder described as a "fairly devastating hippocampal injury."[113] Dr. Snyder took the court through a study of trauma patients which found that a reduction in hippocampal volume and lateral ventricular enlargement were significantly associated with impaired memory functions, memory complaints and executive functions.[114] Dr. Snyder's testimony even revealed that the Government's exhibits are consistent with significant brain atrophy induced by TBI.[115]

---

[110] *Id.* at 80:1–15.

[111] *Id.* at 80:23–81:13.

[112] *Id.* at 91:8–24.

[113] *Id.* at 93:13-19.

[114] *Id.* at 85:2-86:7 (discussing Pl. Exh. 57).

[115] *Id.* at 90:3-91:3 (discussing Def. Exh. 69, at 6).

The Court agrees that the findings on the images between 2013 and 2015 are almost identical. Stated another way, Dr. Schmidt's brain showed no



*Figure 2 Dr. Snyder demonstrated brain atrophy in Jerry Schmidt*

changes between 2013 and 2015, including organic brain damage, Alzheimer's, or other dementias. However, between 2015 and 2018, Dr. Snyder identified, and the Court actually saw, visible brain damage that illustrated Plaintiff's brain shrinking at a very abnormal rate:

In contrast, every defense expert had access to this imaging but chose not to look at it before reaching opinions that contradict the treating radiologist and Dr. Snyder. Instead, defense experts looked at a handful of screenshots, generated from the 4,031 slices of brain imaging in evidence.[116] Dr. Snyder testified that looking at screenshots "would be malpractice" in the clinical context.[117]

---

[116] *See* Pl. Exhs. 161, 162, 163 (CDs containing underlying images).

[117] Tr. at 82:22–83:3 (Dr. Snyder).

At best, Defense expert testimony was inconsistent. For example, initially, Dr. Chalela had no criticisms of Dr. Snyder's imaging interpretation.[118] Yet, the Government provided no explanation for why Dr. Chalela took a diametrically opposite view in trial and did so entirely on the basis of screenshots of MRI imaging, rather than viewing the actual films.[119] In any event, Defense experts deviated from standard medical practice. For example, even though in his clinical practice Dr. Chalela examines a patient before diagnosing him, he expects the Court to accept his diagnosis for Jerry Schmidt without ever meeting the man.[120] *See Kumho Tire Co. Ltd. v. Carmichael*, 526 U.S. 137, 152 (1999) (the Court must ensure that the expert employs "in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field"). Second, Dr. Chalela testified that he would normally look at the images in his clinical practice "[i]f they are available and I have time."[121] Since they were available, the Court can only conclude that Dr. Chalela did not take the time to review these images.

3. *MEG & EEG Testing.*

Beyond the objective neuropsychological testing and MRI scans, multiple tests corroborated Dr. Schmidt's post-concussive traumatic brain damage diagnosis. For example, on March 7, 2016, his treating neurologist, Dr.

---

[118] Tr. at 66:4-11 (July 21, 2020) (Dr. Chalela).

[119] *Id.* at 21:5-9.

[120] *Id.* at 68:6-10.

[121] *Id.* at 68:3-6.

Raymond, administered an EEG.[122] The EEG showed a focal structural abnormality and cortical irritability. And again, on October 3, 2016 she ordered a second EEG. This one confirmed the same focal structural abnormality seen on the last EEG.[123]

Plaintiff's expert, Dr. Jeffrey Lewine, also subjected Dr. Schmidt to extensive MEG and EEG testing. The Court finds Dr. Lewine's testimony and testing reliable. Dr. Jeffery Lewine is Professor of Translational Neuroscience at the Mind Research Network and an Adjunct Professor of Psychology and Neurology at the University of New Mexico.[124] The Mind Research Network is a non-profit research institute located on the University of New Mexico campus.[125] Their facilities provide access to multiple imaging modalities, including MRI, fMRI, EEG, and Magnetoencephalography (MEG).[126] Dr. Lewine has published over 60 peer-reviewed scientific articles, authored the leading textbook Functional Brain Imaging, and has research funding from federal agencies including NIH, NSF, DARPA, DoD, and DoE.[127]

Dr. Lewine has a bachelors, masters, and Ph.D. from the University of Rochester, with the latter two degrees from the School of Medicine.[128] Following his doctorate, Dr. Lewine worked as the Director's Fellow at the

---

[122] Pl. Exh. 1, at 35.

[123] *Id.* at 55.

[124] Pl. Exh. 7 (Dr. Lewine CV).

[125] Tr. at 223:19-22 (Dr. Lewine).

[126] *Id.* at 225:5-25.

[127] *Id.* at 230:19-231:8; 401:12-16

[128] Pl. Exh. 7.

Los Alamos National Laboratory in Biophysics and Neuroscience.[129] And Dr. Lewine has nearly three decades of experience, training, and education in neuroscience and neuroscience testing modalities.[130]

Over the course of a week in June 2018, Dr. Lewine and his team subjected Dr. Schmidt to a series of objective tests: EEG, qEEG, MEG, qMEG, MRI volumetric testing, audiology testing, and behavioral testing.[131] He testified that he used multiple modalities to determine if a convergent validity exists in the mechanism of injury.[132] Stated another way, no one test is both highly specific (*i.e.*, correctly identifying individuals without a particular condition as not having that condition) and highly sensitive (*i.e.*, correctly identifying a particular condition in someone who truly has that condition).[133] But when a neuroscientist combines multiple modalities, they converge on a valid mechanism of injury.[134] Based on his testing, Dr. Lewine reached four primary conclusions to a reasonable degree of neuroscientific certainty.

First, Dr. Lewine concluded the testing showed overwhelming evidence of a traumatic brain injury based on structural and functional assessments:[135]

---

[129]  *Id.*

[130]  *Id.*

[131]  Tr. at 289:10-14 (Dr. Lewine).

[132]  *Id.* at 250:14-24.

[133]  *Id.* at 253:18-254:7.

[134]  *Id.*

[135]  *Id.* at 243:5-8.

- The behavioral testing showed impaired paired-associates learning, mildly impaired impulse control, and impaired inter-hemispheric integration;[136]

- The EEG testing—consistent with the treating doctor's EEG testing—showed abnormal bitemporal slowing, and impaired functional connectivity as indexed by abnormally low coherence, especially in inter-hemispheric derivations;[137]

- The MEG showed abnormal dipolar slow wave activity and sharp waves arising from the left temporal lobe;[138] and

- Dr. Snyder's MRI findings showed evidence of substantial atrophy between 2015 and 2018 at a rate beyond expectations for normal aging.[139]

Dr. Schmidt's imaging reveals that the right and left halves of his brain are not talking to each other properly—a sign of "colossal damage."[140] Second, Dr. Lewine concluded the observations across assessments show convergent validity.[141] In support, Dr. Lewine offered peer-reviewed treatises that definitively link delayed memory processing to hippocampal and associated

---

[136] *Id.* at 281:7-11; 283:10-24.

[137] *Id.* at 274:7-9; 275:17; 276:6-14.

[138] *Id.* at 264:14-25; 269:4-8.

[139] *Id.* at 290:20-24.

[140] *Id.* at 284:2-4.

[141] *Id.* at 299:25-300:4.

temporal lobe networks.[142] Dr. Lewine also provided the Court reliable medical journals on the same.[143]

Third, Dr. Lewine concluded—and the Court agrees—that the overall profile is most consistent, to a reasonable degree of neuroscientific certainty, with traumatic brain damage caused by the wreck in October 2015.[144] Fourth and finally, to a reasonable degree of neuroscientific certainty, Dr. Lewine opined that Dr. Schmidt's clinical and neurobiological status was compromised by traumatic brain damage sustained in the wreck in October 2015. Dr. Lewine demonstrated the mechanism of injury was most likely a secondary cascade of neuroinflammation and excitotoxic events that resulted in transient but significant loss of cells throughout the brain, especially in the hippocampus.[145]

In reaching his opinions, Dr. Lewine not only used an acceptable method, but based on scientific literature provided to the Court, employed the preferred method for accurately diagnosing TBI—convergent validity:[146]

---

[142]  *Id.* at 254:15-255:2 (citing Pl. Exh. 48); 256:9-16 (citing Pl. Exh. 42); 257:25-258:11 (citing Pl. Exh. 49); 259:7-12 (citing Pl. Exh. 80); 262:21-263:2 (citing Pl. Exh. 86); 265:13-266:2 (Pl. Exh. 85); 267:13-15 (Pl. Exh. 97); 268:10-22 (Pl. Exh. 97); 302:11-18 (citing Pl. Exh. 50)

[143]  *Id.* 256:13-16, 259:7-12 (Journal of Neurotrauma); 258:7-11 (Journal of Neuropsychiatry, Clinical Neuroscience); 267:13-15 (Neuroimage Clinical Journal); 268:20-22 (Journal of Heat Trauma & Rehabilitation).

[144]  *Id.* at 243:9-14.

[145]  *Id.* at 271:2-8.

[146]  Pl. Demonstrative Exh. 211, at 6.



*Figure 3: convergent validity combines multiple modalities, taking information from all available sources to identify the cause of injury.*

In contrast, the Government's experts did not review all available evidence, did not perform testing on Dr. Schmidt, and did not examine him whatsoever.

## PRE-EXISTING RISK FACTORS FOR INJURY

Defendant correctly notes that most traumatic brain injuries (or concussions) resolve spontaneously. But Defendant admits that not all do. In fact, some post-concussive patients never recover. For example, the Defendant's expert Dr. Loftus wrote a book that explains, "patients with prolonged symptom recovery greater than one to two years have

demonstrated little chance for complete recovery."[147] Experts from both sides of the aisle agree on this basic principle of brain damage science.[148]

## 1. *Secondary Cascade Traumatic Damage Process*

Plaintiff's experts opined that a "secondary cascade" causes some patients permanent damage. This series of problems, known as the "second injury cascade," damages processes down to the cellular level, such as the release of excited transmitters, disruption of blood brain carrier, changes in glucose metabolism, and most importantly, triggers a neuro-inflammatory response that develops in the weeks following a primary injury.[149] Defense experts confirmed this mechanism of damage.[150] Dr. Loftus' book also explained how primary and secondary damage occurs in traumatic brain injury patients.[151]

So, the primary injury to Dr. Schmidt occurred in the car on October 13, 2015.[152] And the secondary injury occurred over the course of weeks following the wreck.[153] Importantly, the Government concedes that Jerry Schmidt's

---

[147]  Tr. at 919:9–16 (Dr. Loftus).

[148]  *E.g.*, Tr. at 95:18–22 (Dr. Snyder); Tr. at 150:18–22 (Dr. Dees); Tr. at 196:17–197:7 (Dr. Thoma); Tr. at 769:10-18 (Dr. Chalela); Tr. at 919:9–16 (Dr. Loftus).

[149]  Tr. at 271:2-7 (Dr. Lewine).

[150]  *E.g.*, Tr. at 738:11–21 (Dr. Chalela); "forces involved in the wreck totaled Dr. Schmidt's car," Dkt. No. 74, at 2 ¶ 14 (Stipulations).

[151]  Tr. at 97:5–99:1 (Dr. Snyder) (referring to Gov't. Exh. 92, at 151).

[152]  Tr. at 147:21–148:8 (Dr. Dees explaining the acceleration-deceleration injury in the wreck); Tr. at 270–271 (Dr. Lewine).

[153]  Tr. at 96:6–17 (Dr. Snyder testified that "atrophy does not occur immediately following a traumatic event;" instead, atrophy takes weeks to months to appear and stabilizes after that time. ).

cognitive problems are real, significant, and absolutely life altering.[154] Instead, like *Rufo v. United States*, No. 18-2138, 2020 WL 968973 (C.D. Cal. Feb. 28, 2020) (over $4 million FTCA verdict for mild TBI in individual with numerous pre-existing conditions), the Government's entire case hinges on Dr. Schmidt's medical history prior to the wreck.

In actuality, Jerry Schmidt's pre-existing conditions made him vulnerable to trauma and "gave him very little functional reserve for when he had a traumatic brain injury."[155] Even the Government's own expert—Dr. Loftus—explains in his book how a patient's pre-existing medical history creates the very conditions for secondary cascade.[156] In trial, Plaintiff created a checklist of the pre-existing conditions—like depression, PTSD, and ADD—that Dr. Loftus admitted were risk factors for the secondary cascade:

---

[154] Tr. at 766:20-22 (Dr. Chalela); Tr. at 920:7-9 (Dr. Loftus).

[155] Tr. at 131:25–132:4 (Dr. Snyder).

[156] Tr. 909–915 (Dr. Loftus).



*Figure 4 Demonstrative aide created during the cross examination of Dr. Loftus, explaining his testimony that Jerry Schmidt had multiple risk factors that caused what would otherwise be a transient injury to become permanent brain damage.*

For the purposes of Plaintiff's outcome, 'mild' TBI is a misnomer. In fact, the literature states only a "weak relationship" between the severity of primary trauma (i.e., car wreck) and outcome.[157] And "this discrepancy between the primary injury severity and cognitive outcome reflects the inadequacy of the primary severity to describe the whole spectrum of TBI [and] the complexity of the recovery."[158]

## 2. *Fact-Witness testimony confirms Plaintiff's experts' conclusions.*

But just as important, the Government's version of events does not line up with the evidence. Had Dr. Schmidt experienced this cognitive decline for over five to ten years before the wreck, why did his close friends and family not notice it? Multiple friends and family members testified on behalf of the Plaintiff. For example, Dr. Dobyns practiced medicine alongside Plaintiff for over thirty years and considered Dr. Schmidt to be one of his closest friends.[159] Another close friend, Marie Wilborn, testified that before the wreck Plaintiff's memory was "very, very sharp" despite his age.[160] Before the wreck, not a single person in Plaintiff's life observed a condition that

---

[157] Tr. at 88:5–18 (Dr. Snyder) (citing Pl. Exh. 57).

[158] *Id.* at 88:13–18. Dr. Snyder also testified that studies have shown "the initial severity and the initial symptoms do not correlate well with long-term outcomes." *Id.* at 88:22–89:3.

[159] Tr. at 516:2-9 (Dr. Dobyns).

[160] Tr. at 499:16 (Marie Wilborn).

prevented him from doing what he loved—practicing psychology.[161] But all of that changed after the wreck.[162]

And Jerry Schmidt's son, Wesley Schmidt, testified that they see each other three to five times a week and have been close his entire life.[163] Likewise, Jerry Schmidt's brother talks to him daily.[164] Both noticed a stark change in cognitive abilities—a "black and white" change—after the wreck.[165] In sum, the Government provided no plausible reason why, if these pre-existing conditions caused the injury, no friend or family member noticed these problems before the wreck. In contrast, Plaintiff's experts opined, and defense experts conceded, that the pre-existing conditions are risk factors for permanent brain damage in this type of wreck.

On this issue, the case has similarities to *Koch v. United States,* 857 F.3d 267 (5th Cir. 2017). On appeal, the Government argued that the District Court erred by finding factual and legal causation where the Government offered contrary evidence through rebuttal experts and prior medical records. *Koch*, 857 F.3d at 275. In affirming the District Court, the Fifth Circuit endorsed the lower court's reasoning—that when choosing between two competing causation theories, crediting lay witness testimony is proper. *Koch,* 857 F.3d at 276 (District Court "credited the testimony of Koch, his wife, and his supervisor, all of whom bore witness to the fact that prior to his

---

[161] *E.g.*, *id.* at 518:3-7; 520:8–13 (never noticed cognitive or forgetfulness issues before the wreck, only after).

[162] *Id.* at 518:8-11; 501:2–3.

[163] Tr. at 606:11–18 (Wesley Schmidt).

[164] Tr. at 559:10–23 (James Schmidt).

[165] Tr. at 574:2–7 (James Schmidt); Tr. at 609:13–24 (Wesley Schmidt).

accident…Koch was not disabled but was active in his job…at home, and socially"). The lay witness testimony was incompatible with the Government's preexisting condition theory, so the court rejected the theory altogether. *Id.*

For the same reasons, the Court finds that the Government's dementia theory lacks merit in light of the substantial lay witness testimony to the contrary. The friends, family, and coworkers "bore witness to the fact that prior to the accident," Dr. Schmidt was still practicing psychology, independently living at home, and certainly was social. *Koch,* 857 F.3d at 276. The Court credits their testimony accordingly and concludes that the pre-existing conditions made Jerry Schmidt particularly vulnerable to permanent brain damage.

## CAUSATION

Plaintiff's causation theory was straightforward. Plaintiff argued that the wreck caused a mild traumatic brain injury consisting of two phases—a primary injury and a secondary cascade injury.[166] The primary injury, Plaintiff argued, was the concussive state immediately following the wreck when Plaintiff's head and neck suddenly thrashed forward and backward. The secondary cascade injury consisted of a constellation of brain abnormalities that developed in the days and weeks after the wreck. Plaintiff acknowledged the presence of possible preexisting issues such as memory loss and high blood pressure but argued that Dr. Schmidt's brain and cognitive

---

[166] *See supra*, Pre-existing Risk Factors for Injury, at pg. 28

function before and after the wreck establish by a preponderance standard that the wreck, rather than any preexisting issues, explain Plaintiff's impairment.

On the other hand, Defendant's causation theory was rather unusual. The Government took the arduous position that Plaintiff suffered no injury whatsoever. To explain why then Plaintiff's mental state is permanently and significantly impaired, the Government suggested a host of possible explanations that the Court will analyze further below.

1.   ***The Government caused brain damage to Jerry Schmidt***

Multiple experts concluded, and the Court agrees, that to a reasonable degree of medical certainty the wreck caused traumatic brain damage.[167] And



*Figure 5 Demonstration of agreement on causation. Blue dots represent Plaintiff's experts; red dots represent Defense experts; and green dots represent treating doctors.*

---

[167]   Tr. at 95:3–6, 118:5–17 (Dr. Snyder); Tr. at 141:16–19 (Dr. Dees); Tr. at 196:5–16 (Dr. Thoma); Tr. at 243:5–14 (Dr. Lewine).

there was universal agreement upon the premises that form the foundation of this conclusion:

Both sides agree that a normal CT or MRI does not rule out brain damage in Jerry Schmidt.[168] The imaging shows that between 2015 and 2018, Dr. Schmidt has atrophy in multiple areas of his brain.[169] Atrophy occurs where brain cells die and the brain shrinks.[170] In Jerry's case, millions of neurons have died, upwards of 20–30 percent of his brain.[171] Dr. Snyder went through examples of literature that link atrophy in the brain to traumatic brain damage.[172] And the atrophy seen on the films between 2015 and 2018 are beyond all expectations for normal aging.[173] Finally, patients with prolonged symptom recovery greater than two years have demonstrated little chance toward complete recovery.[174] Once brain cells die, they do not regenerate. Dr. Snyder testified that he does not expect Jerry to recover the function that was lost following the wreck.[175]

---

[168] *Supra*, notes 42, 43 & accompanying text, at pg. 11.

[169] Tr. at 95:12–14 (Dr. Snyder)

[170] *Id.* at 83:17–21.

[171] *Id.* at 83:22–84:3.

[172] *Id.* at 84:9–25.

[173] *Id.* at 95:15–17.

[174] Tr. at 95:18–22 (Dr. Snyder); Tr. at 150:18–22 (Dr. Dees); Tr. at 196:17–197:7 (Dr. Thoma).

[175] Tr. at 96:2–5 (Dr. Snyder). Dr. Dees testified that most of the improvement following traumatic brain damage occurs in the first year. Tr. at 150:6–14.

2.   ***The lone VA record does not break the causal chain***

The evidence presented at trial does not support the Government's theory. First, Jerry Schmidt was not incapacitated or disabled prior to the wreck.[176] The fact witnesses at trial confirmed that Jerry Schmidt had no incapacity or disability prior to the wreck.[177] No treating provider or physician prior to the crash diagnosed him with dementia, Alzheimer's disease, or stroke.[178]

Plaintiff presented credible evidence that Jerry Schmidt's pre-existing conditions, without the car wreck, were the type that would not inevitably worsen.[179] In fact, in the months prior to the wreck, the treatment the VA provided—addressing his depression and sleep—was designed to reverse these issues.[180] And the evidence showed that the VA's treatment worked. Dr. Schmidt returned to the VA for his one month follow up visit. At this visit, the records show that Dr. Schmidt reported improvement.[181] Instead, Jerry Schmidt's pre-existing conditions made him particularly vulnerable to permanent traumatic brain damage.[182]

---

[176]   *See Koch*, 857 F.3d at 273.

[177]   Tr. at 617:8–10 (Wesley Schmidt); Tr. at 499:8–22 (Marie Wilborn); Tr. at 518:3–11 (Robert Dobyns); Tr. at 568:13–16 (James Schmidt).

[178]   Tr. at 814:10–15, 814:25–815:3 (Dr. Vidouria); Tr. at 1311:15–1312:1 (Dr. Boone).

[179]   *E.g.*, Tr. at 458:16–23, 459:9–13. (Dr. Bigler testifies that preexisting condition is treatable and reversible).

[180]   *Id.* at 459:18–25.

[181]   Pl. Exh. 160, at 8 ("He states that he has been doing fairly well since [his] last visit, sleep and improved when he self-decreased [his sleep medication]…he denies a depressed mood [and] all other clinical features of depression.").

[182]   *Supra*, Pre-existing Risk Factors for Injury, at pg. 28.

In making its pre-existing conditions argument, the Government relies heavily on one visit to the VA in 2015. The Court notes that the complaints Dr. Schmidt presented to his providers were subjective. Even so, the VA was not concerned enough to order any objective testing. For example, Dr. Raymond, following the wreck, referred Dr. Schmidt three sperate times to neuropsychological testing,[183] and referred him to get EEG and MRI scans.[184] In contrast, the VA attributed his concerns to depression and did not refer him to neuroimaging, neuropsychology, or even neurology.[185] Moreover, multiple doctors, including treating providers, reviewed the VA records but still concluded that Jerry's Schmidt's cognitive problems resulted from the car wreck.[186]

## ALTERNATIVE POSSIBLE CAUSES

After reviewing the trial record, the Court concludes that Plaintiff's experts went through all possible alternative causes of Dr. Schmidt's current problems and ruled them out to a reasonable degree of probability. The Court finds this testimony credible and persuasive.

---

[183] Tr. at 57:13–15 (July 21, 2020) (Dr. Chalela).

[184] Pl. Exh. 1, at 14 (MRI Referral); Pl. Exh. 150, at 24 (EEG referral), 17 (EMG referral), 13 (second EEG referral).

[185] Tr. at 51:22–52:1, 54:18–25 (July 21, 2020) (Dr. Chalela); *see also* Tr. at 209:24–210:12 (Dr. Thoma).

[186] Tr. at 130:10–132:9 (Dr. Snyder); 156:17–158:11 (Dr. Dees); Tr. at 200:15–201:16 (Dr. Thoma testifies that the VA records do not constitute objective evidence).

1.   *Organic Dementias*

1.1.   **No organic dementia caused Plaintiff's harm**

Dr. Snyder testified that he ruled out Alzheimer's or other dementias because (1) it would be "quite coincidental" that such a disease would hit right after the wreck, (2) the atrophy seen on Jerry's films is "too rapid" for organic dementias, and (3) these diseases atrophy specific parts of the brain, whereas Jerry has global atrophy.[187] For example, frontal temporal dementia causes atrophy in the frontal and temporal regions of the brain, whereas Jerry's brain scans show atrophy globally.[188] Likewise, Alzheimer's dementia causes atrophy focused in the temporal and parietal lobes.[189] In essence, Plaintiff's imaging revealed "too much" atrophy to fit aging, dementia or Alzheimer's.[190] And one of the Government's experts agreed.[191]

Dr. Snyder also considered and ruled out vascular dementia, which is a common problem that he sees in his clinical practice. Since vascular dementia manifests with strokes throughout the brain, Dr. Snyder took the Court through the imaging, which showed no evidence of stroke.[192] Next, Dr. Snyder showed the Court an example from peer-reviewed literature on

---

[187]  Tr. at 105:7–107:25 (Dr. Snyder).

[188]  *Id.* at 111:17–16.

[189]  *Id.* at 106:21–107:10.

[190]  *Id.* at 106:13.

[191]  Tr. at 922:2-6 (Dr. Loftus) (testifying that atrophy across 2015-2018 images exceeds all expectations for normal aging).

[192]  Tr. at 113:2–16 (Dr. Snyder); Tr. at 211:6–9 (Dr. Thoma testifies to the same).

vascular dementia, which looked nothing like Jerry's imaging.[193] Finally, after a thorough review of the medical records in this case, the Court cannot find a single treating provider who diagnosed Dr. Schmidt with any type of stroke—small or large. Defense experts conceded this point.[194]

Next, the treating neuropsychologist testified that Dr. Schmidt's neuropsychological testing showed improvement in some domains between 2015 and 2016, which he attributed to the cognitive rehabilitation therapy done between the tests.[195] These improvements correlate with traumatic brain injury rather than dementia or other decline.[196]



*Figure 6 Dr. Thoma charted the neuropsychological test results over the years. They show either stability of test results, or improvement in some domains. Trial testimony proved dementias over the same time frame would show a gradual decline.*

---

[193]  Tr. at 114:1–115:12 (Dr. Snyder).

[194]  *E.g.*, Tr. at 1311:24–1312:1 (Dr. Boone).

[195]  Tr. at 151:18–25 (Dr. Snyder).

[196]  *Id.* at 152:1–6; see also Tr. at 192:11–195:13 (Dr. Thoma charts results over three sets of tests).

Combining imaging with neuropsychological testing, Dr. Lewine testified that Plaintiff's change is not explained by normal aging, neurocognitive dementia, or Alzheimer's.[197] Most dementia processes are gradual, whereas here, the evidence suggests something very dramatic happened that was not present before the crash.[198]

Finally, not a single treating physician ever diagnosed Dr. Schmidt with a cognitive disorder before the wreck.[199] In fact, Plaintiff's visit with the VA shortly before the crash did not prompt his providers to diagnose Plaintiff with a cognitive disorder.[200] Instead, Plaintiff's medical history was classified as "pseudodementia" related to neuropsychiatric factors.[201] But they didn't recommend further consultation or testing.[202] And in the last visit before the wreck, Dr. Schmidt showed so much improvement that the VA decided he did not need a close follow up.[203] Plaintiff's medical records from before the accident simply concern self-reported memory loss. On cross examination, the Government's neurologist admitted that self-reported memory loss "does not…correlate with subsequent development of dementia."[204] If the data do not support the connection, why should the Court?

---

[197] Tr. at 292:14-18 (Dr. Lewine).

[198] *Id.* at 292:8-13.

[199] Tr. at 1311:18-20 (Dr. Boone).

[200] Tr. at 985:4-8 (Dr. Vidouria).

[201] Tr. at 460:9-10 (Dr. Bigler).

[202] *Id.*

[203] Pl. Exh. 160, at 8–10.

[204] Tr. at 749:16-19 (Dr. Chalela).

1.2.     **Traumatic brain damage actually causes dementia**

Contrary to the Government's position, the evidence at trial actually showed that traumatic brain injuries—like the one Dr. Schmidt suffered—cause dementia.[205] Both Plaintiff's literature and the Government's sponsored literature supports this conclusion.[206] Plaintiff also referred the Court to the Barnes 2018 article concerning the matter. That article analyzed a population of nearly 180,000 individuals diagnosed at the VA and found that there was a two-fold relationship between TBI and dementia, even with those patients who had no loss of consciousness.[207] Then, there was the Lee article which showed even the mildest of traumatic brain injuries create a "significant risk factor" for dementia.[208] Or take the Denmark study, which looked at over 2.7 million people and found the same.[209]

In the end, the Defense experts had to concede that the literature linked traumatic brain damage not only to dementia, but to vascular dementia specifically.[210] The Court also concludes that the preponderance of the evidence proves that Dr. Schmidt's traumatic brain damage will cause, if it hasn't already, dementia.

---

[205]   Tr. at 89:14–90:2 (Dr. Snyder); Tr. at 152:6–13 (Dr. Dees).

[206]   *E.g.*, Tr. at 89:7–24 (discussing Gov't. Exh. 69, "Dementia resulting from traumatic brain injury.").

[207]   Tr. at 89:14–24 (Dr. Snyder); Pl. Exh. 50 (Barnes article).

[208]   Pl. Exh. 79; Tr. at 809:14–810:4 (Dr. Vidouria).

[209]   Tr. at 810:5–20 (Dr. Vidouria); Pl. Exh. 82.

[210]   Tr. at 63:24–64:10 (July 21, 2020) (Dr. Chalela).

## 2.   *Hypertension*

Once again, Plaintiff's imaging seriously questions the merit of this theory. For hypertension to be plausible, Dr. Schmidt's ventricles would not dramatically change after the crash—but remain unchanged from 2013 to 2015.[211] The imaging enabled multiple experts to rule out hypertension as a possible cause.[212] The Government never explains, nor can it explain, why hypertension struck Dr. Schmidt with brain damage on the day of the wreck.

To be sure, every Plaintiff expert considered whether hypertension was the cause. Dr. Snyder considered hypertension but conclusively excluded it. First, patients with hypertension-caused brain damage manifest hemorrhages in the basal ganglia. Dr. Snyder showed the Court the basal ganglia and pointed out that there was no indication of hemorrhages. Second, Dr. Snyder testified Jerry's imaging showed no lacunar infarcts: "He does not have a single infarct."[213] Third, patients with hypertension-caused brain damage show *progressive* white matter disease. In Jerry Schmidt's case, the imaging showed white matter diseases, but Dr. Snyder took the Court through the sequential imaging and showed the white matter remained stable, not progressive.[214] And while he may have changed his tune at trial, in deposition, Dr. Chalela testified that he could not conclude to a reasonable

---

[211]   Tr. at 210:22-211:5 (Dr. Thoma).

[212]   *E.g.*, *id.*

[213]   Tr. at 116 (Dr. Snyder).

[214]   *Id.* at 115:15–116:22.

degree of certainty that the white matter changes caused Dr. Schmidt's brain damage.[215]

Finally, hypertension causes brain damage by causing strokes in the brain. But again, Dr. Schmidt's imaging was negative for stroke.[216] Dr. Snyder also noted "there's no support in the medical record" linking hypertension to Dr. Schmidt's atrophy.[217] Likewise, Dr. Lewine explained that Plaintiff's imaging and neuropsychological profile is inconsistent with hypertension.[218] Not one treating physician even diagnosed Dr. Schmidt with hypertensive strokes.

The Court acknowledges that the Government's proof aimed to establish the following—that Plaintiff's hypertension *could* explain his impairment. But something that could explain his impairment does not mean the evidence shows that it *does* explain his impairment. The Court finds that the timing, the imaging, the medical records, and testimony credibly and persuasively rule out hypertension as a potential cause of Dr. Schmidt's cognitive issues.

### 3.   *Jerry Schmidt's son's death*

The Government also tried to blame Plaintiff's son's death as the cause of some or all of Dr. Schmidt's harm. In this way, the Government's tactic has

---

[215] Dkt. No. 108, at 10 (Mar. 5, 2020).

[216] Tr. at 117:12–23 (Dr. Snyder); *see also* Tr. 210:13–211:1 (hypertension causing ventricular enlargement occurs over the course of years to decades, not at the rate seen in Dr. Schmidt).

[217] *Id.* at 117:8-11.

[218] Tr. at 292:14-18 (Dr. Lewine).

not changed since *Rufo*, where it tried to blame the Plaintiff's mom's death four months after the wreck as the cause. 2020 WL 968973, at *1. Unlike *Rufo*, Jerry Schmidt's son passed a year after the wreck.[219] The timing makes a big difference because his son died *after* the second neuropsychological test. So, it would be impossible for his son's death to affect the results of first two tests.[220] The treating neuropsychologist—who administered two sets of tests on Jerry and supervised a year of cognitive therapy—testified that the loss of his child would not account for Jerry Schmidt's performance over two years and two periods of testing.[221] Then Dr. Thoma's testing occurred a year and a half after his son's death such that it also would not affect the testing.[222]

The Government implies that Jerry's son's death is the reason he quit practicing psychology. This speculation contradicts the treating doctor's testimony, which established that Jerry had concerns about his ability to practice when they first met in 2015, before his son's death.[223]

In sum, the Court finds that while the death of a son is a tragic loss for Dr. Schmidt, the preponderance of the evidence does not show that it caused or contributed to the cognitive problems faced by Dr. Schmidt and the damages requested by Plaintiff.

---

[219] Pl. Exh. 153-B at 83 (Record dated October 24, 2016 noting that his son died the previous week).

[220] Tr. at 159:11–22 (Dr. Dees); Tr. at 172:6–10 (Dr. Thoma).

[221] Tr. at 156:12–16, 156:12–16 (Dr. Dees).

[222] Tr. at 172:18–173:7 (Dr. Thoma also took into account his son's testing when testing Jerry Schmidt).

[223] Tr. at 137:10–16 (Dr. Dees).

4. *Natural Aging*

Dr. Snyder considered the possibility that age was the cause of Jerry's cognitive deficits but ruled it out because the rates of atrophy seen on the films far exceeded that of aging.[224] Specifically, the literature shows 0.32%/year atrophy for normal aging, whereas Jerry had lost 20-30 percent of brain volume following the wreck.[225]

Based on the testimony heard at trial and after weighing the evidence and credibility, the Court finds that natural aging cannot cause the damages in this case.



Scahill, R. I., C. Frost, R. Jenkins, J. L. Whitwell, M. N. Rossor and N. C. Fox (2003).  "A longitudinal study of brain volume changes in normal aging using serial registered magnetic resonance imaging." Arch Neurol 60(7): 989-994.

*Figure 7 Dr. Snyder's testimony revealed that the atrophy seen in Jerry Schmidt's imaging scans ruled out natural aging as a cause.*

---

[224] Tr at 101:6–103:8 (Dr. Snyder).

[225] Tr. at 102:6–103:8 (Dr. Snyder); *see also* Pl. Demonstrative Exh. 210, at 5 (discussed at Tr. 104:22–105:2).

5. *Lying, Faking, or Malingering*

Next, the Government resorted to calling Dr. Schmidt a faker. Its position lacks evidentiary support. First, the treating neuropsychologist considered and rejected the possibility that Jerry Schmidt was malingering or not

| Test | Cognitive Domain | Measure | Passing Score | Jerry's Score | Indication |
|---|---|---|---|---|---|
| **TOMM** | Learning and Recognition Memory | Trial 1 | > 40 | **43** | **PASS** |
| | | Trial 2 | > 45 | **49** | **PASS** |
| | | Retention Trial | > 45 | **47** | **PASS** |
| **REY 15-ITEM TEST** | Memory/ Spatial Organization | n/a | ≥ 12 | **12** | **PASS** |

| Measure | Test | Cognitive domain | Passing Score | Jerry's Score | Indication |
|---|---|---|---|---|---|
| Reliable Digit Span (RDS) | WAIS-IV | Attention & working memory | ≥ 6 | **10** | **PASS** |
| Forced Choice Recognition | CVLT-II | Auditory & verbal memory | ≥14 | **16** | **PASS** |
| Tapping Speed | Finger Tapping Test | Finger speed & fine motor control | > 35 | **36.2** | **PASS** |
| FMT | Wisconsin Card Sorting Test | Executive function & attention | ≤ 4 | **0** | **PASS** |

*Figure 8 Jerry Schmidt passed multiple tests of designed to identify full effort.*

performing to his true ability.[226] Then, Plaintiff's expert Dr. Thoma ran two formal tests of performance validity and four embedded tests.[227] Importantly, with embedded validity tests, the patient doesn't know he's taking a validity test because the test derives the scores from performance on standard neuropsychological tests.[228]

The Government's contention on this matter begins and ends with Dr. Kyle Boone's testimony. Dr. Boone is not a practicing clinical neuropsychologist. In fact, Dr. Boone has not treated a patient clinically in over twelve years.[229] Her entire income—$2.5 to $3 million in expert fees—is derived from testifying as an expert witness and almost exclusively for the Defense.[230] In this case, Dr. Boone reviewed some of Plaintiff's medical records, and reviewed Plaintiff's expert reports. That's it. She did not examine the Plaintiff despite being offered the opportunity to do so multiple times. And she even chose *not* to review the neuropsychological testing data performed on Dr. Schmidt by *both* the treating neuropsychologist and Plaintiff's expert neuropsychologists.[231] In Dr. Boone's thirty plus year career, she admitted she always analyzes the raw imaging and

---

[226] Tr. at 148:22–150:5 (Dr. Dees).

[227] Tr. at 187:17–191:7 (Dr. Thoma).

[228] *Id.* at 190:24–191:5.

[229] Tr. at 1294:12-24 (Dr. Boone)

[230] Tr. at 1297:8-1298:8 (Dr. Boone testifies that she's earned approximately $2.5 million to $3 million in expert fees over the past four to five years testifying 98% of the time for the Defense).

[231] Tr. at 154:5–13 (Dr. Dees testifies that no one other than Dr. Thoma requested the raw data).

neuropsychological data.[232] That's because each battery of tests produces hundreds of pages of raw data, and Jerry Schmidt had three sets of tests.[233] Like the Government's expert witness Dr. Chalela, Dr. Boone does not practice what she used to preach. In her prior clinical practice—and even in ninety percent of her current *expert forensic* work—she examines the patient and reviews the raw test data prior to drawing conclusions about them.[234] And like Dr. Chalela, Dr. Boone offered no credible explanation why Dr. Schmidt did not receive from Dr. Boone "in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *See Kumho Tire Co. Ltd. v. Carmichael*, 526 U.S. 137, 152 (1999).

In weighing her testimony against that of other experts in this case, Dr. Boone's lack of testing, and affirmative decision to ignore the actual testing data performed by treating neuropsychologists and expert neuropsychologists is frankly shocking. Against the 44 neuropsychological tests Plaintiff experts ran on Dr. Schmidt, the Government's neuropsychologist performed none.[235] And Dr. Boone failed to consider testimony of friends and relatives in her neuropsychological review of this case.[236] Moreover, multiple witnesses rejected the Government's accusation, like Plaintiff's brother, who testified that he is "impeccably honest." And trained to spot symptom exaggeration,

---

[232] Tr. at 1290:10-12 (Dr. Boone).

[233] Tr. at 168:11–17 (Dr. Thoma).

[234] Tr. at 1274:3-10; 1291:12-15 (Dr. Boone)

[235] Tr. at 1289:16-21 (Dr. Boone).

[236] *Id.* at 1287:21-23.

Dr. Dees found no signs that Plaintiff is faking or otherwise exaggerating his condition.[237]

In sum, the Government cannot reconcile Dr. Boone's testimony with the rest of the evidence or even its own expert, Dr. Loftus. He testified that Dr. Schmidt was not lying or malingering and was a compliant patient.[238] Based on the testimony heard at trial and after weighing the evidence and credibility, the Court finds that Dr. Schmidt is not lying, faking, or malingering.

6.   ***Did the Vietnam War cause brain damage 41 years later?***

Finally, the Government interjected the idea that Dr. Schmidt's honorable Vietnam War service caused him delayed brain damage, that coincidentally struck the day of the wreck. Ignoring that for 41 years since the war Dr. Schmidt worked as a successful private psychologist, the Government theorized that blast exposure or PTSD from his service in the Vietnam War explains the impairment. But when asked whether Dr. Schmidt's imaging was consistent with close proximity to an explosion, Dr. Lewine explained that "because we have the imaging from 2013 and 2015…that is not consistent with the idea that he [was injured during the Vietnam War]. We have historical information on Jerry which strongly biases us towards the 2015 [car crash] event."[239]

---

[237] Tr. at 149:20–24 (Dr. Dees).

[238] Tr. at 907:2–7 (Dr. Loftus).

[239] Tr. at 323:4-10 (Dr. Lewine).

Dr. Lewine's counter credibly weakens every alternative cause the Government presented. The same analysis invalidates the theory that Plaintiff's small vessel disease explains the loss of brain volume in the imaging.[240] His analysis invalidates the theory that an intense emotional reaction, like grief, explains Plaintiff's cognitive disorder.[241] His analysis invalidates the theory that hypertension is to blame.[242] Simply put, the objective imaging and data therefrom are not consistent with any of the Government's alternative theories.[243]

Crediting Plaintiff's experts in this regard is also in line with *Koch*. Each theory presented by the Government was inherently questionable because the experts opining did not consider key evidence. In *Koch*, the District Court properly credited Plaintiff's experts because they actually met, treated, and evaluated Plaintiff and his imaging while the Defense experts did not. *Koch,* 857 F.3d. at 276. Here, the Government's failure to examine all of the evidence, or even examine Dr. Schmidt, aligns with the outcome in *Koch*.

---

[240]   *Id.* at 389:19-21.

[241]   *Id.* at 419:15-18.

[242]   *Id.* at 425:2-10.

[243]   *Id.* at 323:18-19.

# ECONOMIC DAMAGES

### 1.   *Future Medical Expenses*

On the issue of future medical expenses, Plaintiff provided expert testimony from Dr. Christine Vidouria. The Court finds her testimony credible and persuasive. Dr. Christine Vidouria is a board-certified Physical Medicine & Rehabilitation medical doctor, and Pain Medicine specialist who has practiced medicine in Texas since 2001.[244] She serves as the Medical Director for the HealthSouth Rehabilitation Institute of San Antonio and the Pain Management Program & Methodist Specialty Transplant Hospital in the acute rehab unit.[245] And she earned her medical degree from The University of North Texas HSC—Fort Worth—Texas college of Osteopathic Medicine and a Bachelor of Science in Microbiology from the University of Texas—El Paso.[246] Afterwards, Dr. Vidouria performed her residency at the University of Texas Health Science Center—San Antonio in Physical Medicine & Rehabilitations as well as a fellowship in Interventional Pain Management.[247] Ninety percent of her practice is clinical.[248]

The International Commission on Health Certification certified Dr. Vidouria as a Certified Life Care Planner.[249] Life care planning is a process of

---

[244] Pl. Exh. 10 (Dr. Vidouria CV).

[245] *Id.*

[246] *Id.*

[247] *Id.*

[248] Tr. at 782:3–6 (Dr. Vidouria).

[249] Pl. Exh. 10.

applying objective methodological analysis to formulate diagnostic conclusions and opinions regarding physical and/or mental impairment and disability for the purpose of determining care requirements for individuals with permanent or chronic medical conditions.[250] In preparing a life care plan for Dr. Schmidt, Dr. Vidouria performed a medical examination.[251]

### 1.1.   **Method & Opinions**

Based on these qualifications, Dr. Vidouria offered several opinions to a reasonable degree of medical certainty, which the Court adopts as reliable and credible. First, Dr. Vidouria opined that Dr. Schmidt has physical and cognitive impairments and disabilities, which require lifelong medical care, as a direct and proximate result of the motor vehicle wreck on October 13, 2015.[252]

Second, using the methodology advocated by the American Academy of Physician Life Care Planners and her own medical training and experience, she concluded that Dr. Schmidt has a life expectancy of 14 remaining years.[253] This life expectancy takes into account the potential impact of co-morbidities and Dr. Schmidt's medical history.[254] Importantly, optimal

---

[250]  Tr. at 783:8-25 (Dr. Vidouria).

[251]  *Id.* at 784:17-20.

[252]  *Id.* at 786:6-21.

[253]  *Id.* at 787:3-6; 989:15-21.

[254]  *Id.*

medical care positively affects life expectancy and overall health outcomes for individuals with lifelong medical conditions, like Dr. Schmidt.[255]

Third, based on a review of the record, a personal medical examination of Dr. Schmidt, and her background and qualifications, Dr. Vidouria valued Dr. Schmidt's future care needs at $288,447 annually.[256] Dr. Vidouria itemized, down to the cent, every category of care needed.[257] She testified that these care needs are above and beyond what any normal individual would use and are above and beyond any care needs for any pre-existing problems. In other words, Dr. Vidouria concluded that all of the reasonable and necessary medical treatments and costs that appear in her life care plan are related to the sequalae from Dr. Schmidt's brain injury.

### 1.2.  Life care plan components

Of the $288,447, Dr. Vidouria allocated $243,503 per year to the cost of a home health aide.[258] She provided multiple reasons for this cost. For example, Dr. Schmidt's brain damage has caused him to live in isolation.[259] After the wreck, for reasons discussed in the non-economic damages section of this opinion, he has found himself avoiding other people.[260] As another example, before the wreck Dr. Schmidt could drive himself. Now, because of his memory problems, he often forgets where he's driving. Dr. Vidouria

---

[255] *Id.* at 787:19-25.

[256] Pl. Exh. 2.

[257] *Id.*

[258] *Id.*

[259] Tr. at 807:6-11 (Dr. Vidouria).

[260] *Id.*

identified Dr. Schmidt's cognitive problems when driving—not only as a safety problem for himself—but also for others on the road.[261] Next, she testified that Dr. Schmidt's brain damage causes him to fail to do the things around the house that every independent adult needs to survive. And these failures not only present a safety threat to Dr. Schmidt personally, but also his neighbors in his condo complex.[262]

Other trial evidence supports Dr. Vidouria's testimony. For example, Dr. Dees testified that even when they tested him at age 68, Dr. Schmidt had difficulties with his activities of daily living, such that Dr. Dees worried that he could not live independently in the future.[263] At the time Dr. Dees saw Dr. Schmidt, he recommended limitations on Dr. Schmidt's driving, including driving only to those places he had familiarity with and needing someone to accompany him in the car due to his attentional disruptions.[264] Dr. Dees did not expect his ability to drive to improve over time.[265] Moreover, not a single witness believes he is capable of driving.[266] He cannot manage his finances either.[267] After the accident, Dr. Schmidt could no longer use a computer properly or even recall how to access the Wi-Fi.[268] His son stated the sad, but

---

[261] *Id.*

[262] *Id.*

[263] Tr. at 152:14–18 (Dr. Dees).

[264] *Id.*

[265] *See also id.* at 185:14–25 (Attention, memory, and fine motor deficits on neuropsychological interact to interfere with skills like driving).

[266] *E.g.*, Tr. at 569:5-8 (James Schmidt); 470:12-14 (Dr. Bigler).

[267] Tr. at 612:18-20 (Wesley Schmidt).

[268] Tr. at 567:20-23; 568:5-9 (James Schmidt).

obvious truth—Dr. Schmidt can no longer take care of himself.[269] Multiple experts agreed that Plaintiff's impairment is significant and permanent.[270]

Finally, Dr. Vidouria assigns $33,764 annually for various physician services that Dr. Schmidt needs and the frequency at which he would need them in the future.[271] Examples include rehabilitation physicians and orthopedic physicians' visits, and specific procedures, such as medial nerve blocks and injections.[272] She also identified three other categories: (a) $3,435 yearly for diagnostic and laboratory services needed as a result of Dr. Schmidt's injury; (b) $4,986 per year for medications and durable medical goods to treat the physical problems associated with Dr. Schmidt's spine and the cognitive issues related to his brain damages; and (c) $2,759 per year as the annual cost of physical therapy and case management services.[273] Of note, the types of future medical interventions recommended by Dr. Vidouria mirror the recommendations made by Dr. Dees, the treating neuropsychologist, in 2015 and 2016, following the extensive multi-day neuropsychological testing. This includes neuropsychological interventions, psychopharmacological interventions, individual therapies, and support for activities of daily living, including cognitive rehabilitation.[274]

---

[269] Tr. at 611:6-9 (Wesley Schmidt).

[270] Tr. at 472:24-473:3 (Dr. Bigler); 300:15-18 (Dr. Lewine)

[271] Pl. Exh. 2.

[272] *Id.*

[273] *Id.*

[274] *Id.*

### 1.3.  The Government's life care plan

The Government offered the testimony of Margot Burns to rebut these economic damages. She did not balk at the unit cost of any specific item in Dr. Vidouria's plan. Even though she's not a medical professional of any kind, let alone a rehabilitation doctor, she testified that the she believed Dr. Schmidt only needed $608,400 in attendant care services and $27,040 in chore services.[275]



*Figure 9 Margo Burns testimony on the amount of*
*future home health aide services needed.*

These conclusions are based on the Government's suggestion that Dr. Schmidt is not a risk to himself outside normal business hours. The Court rejects this argument. As Dr. Vidouria testified, people with neuro-cognitive

---

[275] Tr. at 1070:4-7 (home health aide); 1070:17–22 (chore services).

disorders are more likely to get confused during nighttime hours.[276] A lack of care during nighttime hours could cause death or serious injury.[277] Without medical care and supervision, Dr. Schmidt could get the behind the wheel at any time of day. He could confuse his medications at any time of day. He could mismanage his finances at any hour. Plaintiff established more likely than not that a home health aide is medically necessary and the Government's evidence to the contrary, such as it was, is unconvincing.

And Dr. Vidouria testified, and the Court agrees, that the goal of a life care plan—and tort damages generally—is to compensate a plaintiff for a loss by restoring him to his previous level of independence to the extent possible through money damages. VICTOR E. SCHWARTZ, ET AL., PROSSER, WADE, & SCHWARTZ'S TORTS 520 (11th ed. 2005) ("[Compensatory damages are intended to] restore the plaintiff to the position the plaintiff was in before the tort occurred."); *Haygood v. DeEscabedo*, 356 S.W.3d 390, 394 (Tex. 2011) (same); *Reaugh v. McCollum Exploration Co.*, 163 S.W.2d 620, 621 (Tex. 1942) (same). So, the Court finds a home health aide is reasonable and necessary at the frequency described by Dr. Vidouria in her testimony.

### 1.4. **Orthopedic Injuries**

Dr. Vidouria included a small portion of her life care plan dedicated to those orthopedic back injuries that she found to a reasonable degree of medical certainty were related to wreck and not caused by pre-existing damages. As the only rehabilitation doctor, she is uniquely qualified to carve

---

[276] Tr. at 808:10-13 (Dr. Vidouria).

[277] *Id.* at 808:24.

out and make this differentiation. The Court, after reviewing the evidence and her plan, agrees that it is credible and persuasive.

Her plan is also supported by the medical record. After the wreck, his orthopedic doctor, Dr. Kenneth Bunch, offered conservative therapy to address Dr. Schmidt's new back pain after it failed to resolve with the help of medications.[278] Initially, Dr. Bunch referred his patient to physical therapy to address the back pain. After that failed, Dr. Bunch tried steroid injections, but noted that while the steroid injections provided some relief, Dr. Schmidt's pain tended to return.[279] Dr. Bunch also noted that his patient experienced another fall (making three in total since the wreck). Given his falls, and the damage to the femoral nerve as seen in the EMG, Dr. Bunch suggested that his patient consider surgical options and referred him to a neurosurgeon, Dr. K. Michael Webb. After reviewing the imaging and history, Dr. Webb believed that the disc herniation at L4-5, as seen on the December MRI was compressing the L4 nerve root, which was "consistent with the majority of the symptoms" following the wreck in October 2015. As a result of the nerve root compression and because conservative treatments failed Dr. Schmidt, Dr. Webb recommended surgery.[280] So, on August 5, 2016, Dr. Webb performed a total laminectomy with decompression of the lateral recess and bilateral foraminotomies. This spine surgery attempts to decompress the spinal cord by removing the bulging disc and providing support to Dr. Schmidt's spine.

---

[278] Pl. Exh. 1, at 9.

[279] *Id.* at 42.

[280] *Id.* at 50–51.

The spine surgery hospitalized Dr. Schmidt from August 5 to the 8th, at Lakeway Regional Medical Center.[281]

## 2. *Life Expectancy*

Plaintiff offered Dr. Vidouria's expert testimony on life expectancy. Based on her experience as a physical medicine and rehabilitation doctor who follows patients like Dr. Schmidt throughout their entire lives, she concluded that Jerry Schmidt has 14 years of residual life expectancy.[282] The Government did not offer any contrary expert evidence on life expectancy, and in fact, their life care planner testified that she was not qualified to opine on the matter.[283] The Court agrees with Dr. Vidouria and finds this evidence persuasive.

However, the Government asks this Court to further reduce Dr. Schmidt's life expectancy based on smoking and other pre-existing factors.[284] However, Dr. Vidouria and the CDC life tables *already* take into account the negative implications of pre-existing factors like smoking.[285] In fact, the CDC life

---

[281] *Id.*

[282] Tr. at 788–89. The Court also relies on the CDC life tables as evidence of life expectancy, which was offered into evidence without objection from the United States. *See* Pl. Exh. 17; Tr. at 788:1–17 (Dr. Vidouria's testimony).

[283] Tr. at 1036:1-3 (Margot Burns).

[284] The Government argues that Dr. Schmidt only quit smoking recently. This is contrary to the medical record, which shows that Dr. Schmidt quit smoking in the early 2000s. *E.g.*, Pl. Exh. 157a, at 17 ("Patient smoked tobacco until 2004"); Pl. Exh. 160, at 25 ("quit smoking over 7 yrs ago.")

[285] Tr. at 960 (Dr. Vidouria); Pl. Exh. 17, at 56–58 (Technical notes on methodology explaining that the life tables are based on all deaths, regardless of the cause).

tables explicitly discuss the impact of smoking on its data.[286] So, to reduce further would be double dipping.

Moreover, the Government wants the Court to consider comorbidities for *reduction* of life expectancy but not factors that *increase* life expectancy. In contrast, Dr. Vidouria considered both positive and negative factors in reaching the conclusion that Dr. Schmidt has a remaining life expectancy of 14 years.[287] Around the time of the wreck, the records reflect that Dr. Schmidt "exercises 7 days a week with walking, swimming, or biking."[288] At the time, he was still working on a part time basis. The only evidence at trial shows that these activities counterbalance the negative indicators of life expectancy, if any.[289]

To the extent that his brain damage has stopped Dr. Schmidt from doing these activities and thereby contributes to a decrease in life expectancy, the Court finds that Dr. Schmidt should be compensated in the form of non-economic damages for the decreased life expectancy.

---

[286] *E.g.*, Pl. Exh. 17, at 2–4 ("The increasing gap during these years is attributed to increases in male mortality due to ischemic heart disease and lung cancer, both of which increased largely as the result of men's early and widespread adoption of cigarette smoking…").

[287] Tr. at 787:19–25 (Dr. Vidouria).

[288] Pl. Exh. 157a, at 40 (Aug. 26, 2016).

[289] Tr. at 977–78 (Dr. Vidouria).

3.   ***Present Value of Future Economic Damages & Lost Earnings***

Plaintiff offered present value evidence, which the Court accepts as credible and persuasive. Dr. John Swiger is a Professor Emeritus of Finance at Our Lady of the Lake University in San Antonio, Texas.[290] He has special expertise in finance and economics.[291] Dr. Swiger received his doctorate in Finance from the University of North Carolina at Chapel Hill in 1976.[292] Since the late 70s, Dr. Swiger taught finance and economics at the University of Texas at Austin, and then at Our Lady of the Lake University.[293] He has multiple publications and presentations in economics.[294]

Dr. Swiger took the future expenses that Dr. Schmidt faces and provided the Court a reliable and credible present value.[295] Dr. Swiger explained to do this analysis, he first breaks the items of future needs into categories and determines their future cost, using standard inflationary techniques.[296] For example, inflation affects medical care items at a different rate than most other items. Taking differences like this into account, Dr. Swiger testified to the future annual cost of every item in the life care plan provided by Dr. Vidouria.[297]

---

[290]  Pl. Exh. 11 (Dr. Swiger CV).

[291]  *Id.*

[292]  *Id.*

[293]  *Id.*

[294]  *Id.*

[295]  Pl. Exh. 3.

[296]  Tr. at 527:13-20 (Dr. Swiger).

[297]  *Id.* at 531:24-532:10. *See also* Pl. Exh. 3.

Then, Dr. Swiger determined the amount of money needed to be invested today such that the money would grow to meet the future need, given inflation. The Court finds this method "best and safest" investment approach reasonable and complaint with both state and federal law. *See Culver v. Slater Boat Co.*, 722 F.2d 114, 118 (5th Cir. 1983) (Rate to be based on the return available from "the best and safest investments," and to be computed after considering the effect of income tax on the interest received). To do otherwise encourages individuals to take unnecessary financial risks with money allocated for necessary future medical needs. Because these items of care relate to the health and safety of Dr. Schmidt and those around him, unnecessary financial risks should be avoided if at all possible.

Importantly, the Defense finance expert, Scott Bayley, testified that Dr. Swiger's discount rate methodology was reasonable and correct.[298] Based on this methodology, Dr. Swiger concluded to a reasonable degree of financial and economic certainty that the net economic loss to Dr. Schmidt was $2,584,968.[299]

Within this analysis, Dr. Swiger also calculated the lost earnings.[300] As a result of the wreck, Dr. Schmidt had to give up the practice of psychology entirely.[301] Numerous witnesses testified that Dr. Schmidt's joy in life was

---

[298] Tr. at 1201:14–24 (Scott Bayley).

[299] Tr. at 531:24-532:10 (Dr. Swiger); Pl. Exh. 3, at 4 (summary chart of economic losses).

[300] *Id.*

[301] Tr. at 143:4 (Dr. Dees).

helping his patients.[302] But Dr. Schmidt surrendered his psychology license because he feared he would do harm to his patients due to his cognitive problems.[303] The Court agrees with Dr. Dees that Jerry Schmidt reasonably surrendered his license as a result of this wreck. As a practicing psychologist for over 30 years, surrendering his license because he lacked the necessary cognitive function was a "tremendous loss" for Dr. Schmidt that impacted his identity and self-esteem.[304]

During trial, the Government rebutted Dr. Swiger's opinion by noting that Dr. Schmidt was working part time or approaching retirement. But Dr. Swiger calculated the loss based on Dr. Schmidt's part-time employment status.[305] And the only economics expert presented by the Government testified he had no criticisms of Dr. Swiger's lost earning capacity analysis,[306] or lost household services analysis.[307]

The Court therefore finds Dr. Swiger's analysis reasonable and finds that the present value of the future lost income of part-time work and household services is $242,398.[308]

---

[302] *E.g.*, Tr. at 143:10–144:18 (Dr. Dees); Tr. at 564:4-6 (James Schmidt).

[303] Tr. at 143–144 (Dr. Dees).

[304] *Id.*

[305] Pl. Exh. 3, at 1 (summary table on future lost earnings, noting that the numbers are based on salary at the time of injury).

[306] Tr. at 1189:20–24 (Scott Bayley).

[307] *Id.* at 1189:25–1190:11.

[308] Pl. Exh. 3, at 1–2 (present value summary chart).

## NON-ECONOMIC HARM

Multiple friends and family members testified on behalf of the Plaintiff. Dr. Dobyns practiced psychology alongside Plaintiff for over thirty years and considered Dr. Schmidt to be one of his closest friends.[309] Another close friend, Marie Wilborn, testified that before the wreck Plaintiff's memory was "very, very sharp" despite his age.[310] Before the wreck, not a single person in Plaintiff's life observed a condition that prevented him from doing what he loved—practicing psychology.[311] But all of that changed after the wreck.[312]

Plaintiff's family and friends noticed firsthand the damage to his memory following the crash. Ms. Wilborn recalled a recent time where Plaintiff could not recall a name repeated to him 15 times.[313] Deeply embarrassed, Dr. Schmidt withdrew like he has done in almost every other aspect of his day-to-day life.[314] Before the accident, Plaintiff was known as a social butterfly and loved to dance, hike, and swim four to five days a week.[315] She testified that Dr. Schmidt's age or memory never prohibited him from being the last one left on the dance floor.[316] But since the accident, Plaintiff can no longer

---

[309] Tr. at 516:2-9 (Dr. Dobyns).

[310] Tr. at 499:16 (Marie Wilborn).

[311] Tr. at 518:3-7 (Dr. Dobyns).

[312] *Id.* at 518:8-11.

[313] *Id.* at 501:23-25.

[314] *Id.* at 502:1-4; Tr. at 520:19-20 (Dr. Dobyns).

[315] Tr. at 494:23-495:3 (Marie Wilborn).

[316] *Id.* at 495:19-21.

dance, hike, or swim.[317] When Plaintiff attempts to leave his home, he lasts minutes.[318]

Sadly, the list continues. Plaintiff no longer remembers attending events with his children.[319] Plaintiff can no longer maintain romantic relationships because his short-term memory is compromised.[320] He no longer remembers what his best friends do for a living.[321] After 20 minutes go by, Dr. Schmidt cannot remember a story his best friend just shared.[322] He cannot even remember whether or what he has eaten.[323] Dr. Dees testified that the car wreck caused emotional difficulties, including anxiety and depression. Dr. Schmidt surrendered his license and he worried that he would not be able to resume his practice.[324]

These cognitive issues must be a source of significant mental anguish for Dr. Schmidt. The loss of his identity and isolation are also non-economic harms that need compensation. Dr. Schmidt should also take physical disfigurement damages due to the dead brain cells and the surgical scars. Based on this evidence and the other evidence discussed in these findings and presented at trial, the Court believes reasonable compensation for the past and future non-economic harm to Jerry Schmidt is $4,000,000.

---

[317] *Id.* at 498:20-22; 499:3.

[318] *Id.* at 499:3-5.

[319] Tr. at 610:9-12 (Wesley Schmidt).

[320] *Id.* at 610:18-21.

[321] Tr. at 504:7 (Marie Wilborn).

[322] Tr. at 520:15-18 (Dr. Dobyns).

[323] Tr. at 609:19-24 (Wesley Schmidt).

[324] Tr. at 142:12–144:19 (Feb. 10, 2020) (Dr. Dees).

# TEXAS LAW ON DAMAGES

Under Texas law, "proximate cause" means a cause that was a substantial factor in bringing about the injury, and without which the injury would not have occurred. TEX. PATTERN JURY CHARGE: GENERAL NEGLIGENCE § 2.4 (2018). A person using ordinary care would have foreseen that the injury or some similar injury might result from the act or omission complained of. *Id.* There may be more than one proximate cause of an injury. *Id.; see also IHS Cedars Treatment Ctr. v Mason*, 143 S.W.3d 794, 798–99 (Tex. 2004). Generally, Texas law affords the trier of fact great discretion in considering evidence on the issue of damages. *In re State Farm Mut. Auto. Ins. Co.*, 483 S.W.3d 249, 263 (Tex. App.—Fort Worth 2016, no pet.). Where the plaintiff has uncontroverted, objective evidence of injury and the causation of the injury has been established, appellate courts are more likely to overturn a jury finding of no damages for past pain and mental anguish. *Id.* And under Texas law, the Government is responsible for any prior physical infirmity that it aggravated in the wreck on October 13, 2015. *Dallas Railway & Terminal v. Ector*, 116 S.W.2d 683, 507 (Tex. 1938).

## 1.   *Similar Verdicts*

The Court has also reviewed similar cases for an understanding of the appropriate damages in this case:

- *Rufo v. United States*, No. 18-2138, 2020 WL 968973 (C.D. Cal. Feb. 28, 2020) (**$4,099,581.80 FTCA verdict** in a car wreck causing mild TBI to a man with multiple pre-existing conditions);

- *Ream v. United States*, No. 17-1141, 2020 WL 1303429 (W.D. Wash. Mar. 19, 2020). A military convoy caused a wreck resulting in a back injury (without brain damage) to

the Plaintiff. *Id.* at *2. The 50-year-old plaintiff went to the ER complaining of neck and low back pain. *Id.* ¶ 5, 10. Imaging at the ER showed no "acute abnormality" of her spine. *Id.* Unlike Dr. Schmidt's EMG testing, subsequent EMGs showed no abnormalities in this plaintiff. *Id.* ¶ 11. Nevertheless, she required continuing therapy and surgery. *Id.* at *3 ¶ 16. The court awarded $1,454,748.29 in damages. *Id.* at *7 ¶ 31.

- *Ragan v. United States*, No. 5:1999cv00093, 2001 WL 36170312 (E.D. Tex. 2001) (**$10,612,806 FTCA verdict** for a moderate brain damage and orthopedic injuries resulting from motor vehicle wreck);

- *Metheny v. Drina Trans Inc.*, No. DC-16-10181 (Tex. Dist. Ct. 2019) (**$4,700,000 jury verdict** arising out of a motor vehicle wreck resulting in mild traumatic brain damage);

- *Black v. Grocer's Supply Co.*, JVR No. 356764, 1000 WL 41222 (Tex. Dist. Ct. 1996) (**$5,700,000 jury verdict** for 49-year-old who suffered a mild traumatic brain injury following a wreck);

- *Duenez v FFP Operating Partners, L.P.*, JVR No. 375849, 2000 WL 1204223 (Tex. 2000) (**$5,000,000.00 verdict** for a mild traumatic brain injury (TBI) in a head-on collision);

- *Bush v R&L Carriers, Inc.*, JVR No. 1406230028, 2014 WL 2854958 (Tex. Dist. Ct. Apr. 23, 2014) (**$4,088,000.00 verdict** for a mild TBI with memory loss, attention loss, executive functioning damage, and cervical disc injury in a rear-end collision. Defendant contested whether Plaintiff had a TBI.);

- *Harris v RamRod Enterp.*, JVR No. 494722, 2008 WL 4900696 (Tex. Dist. Ct. 2008) (**$4,000,000.00 settlement** for a mild TBI with memory loss and visual impairment when struck by a log at work);

- *Hosick v Morgantown Freight Line*, JVR No. 495723, 2002 WL 34454776 (Tex. Dist. Ct. 2002) (**$4,250,000.00**

**settlement** for mild TBI, memory loss, personality changes in a trucking collision.);

- *Molina v. United States*, No. SA95CA1204, 1996 WL 899071 (W.D. Tex. 1995) (**$2,000,000 settlement** with the United States for medical negligence that resulted in moderate brain damage);

- *L.G. v. United States*, No. SA CV 04-1045-AHS, 2007 WL 3022463 (C.D. Cal. 2007) (**$54,143,370 FTCA verdict** for minor child as a result of motor vehicle wreck causing severe brain damage and orthopedic injuries to a minor);

- *Klinefelter v. Faultersak*, No. 98 CV 909, 1998 WL 1061456 (E.D. Pa. 1998) (**$4,000,000 jury verdict** for a mild brain injury to a 69-year-old man after motor vehicle wreck).

2.    ***Jerry Schmidt's Economic & Non-Economic Losses***

Based on Texas law, the testimony of the witnesses, experts, and a review of the medical records, the Court concludes that Dr. Schmidt's brain damage and associated cognitive deficits are the direct and proximate result of the traumatic brain damage he suffered in the motor vehicle wreck on October 13, 2015. The Court further concludes that Dr. Schmidt's associated back issues, including the surgery and treatments, also flow directly and proximately from the motor vehicle wreck. In all likelihood, these deficits that Dr. Schmidt currently faces are permanent. And but for the wreck, Dr. Schmidt would not have any of the issues described in these findings of fact and conclusions of law.

The Court finds the reasonable and necessary amounts directly and proximately related to the wreck on October 13, 2015 that Jerry Schmidt will incur **net future economic losses of $2,827,366**.[325,326]

The Court also finds that Dr. Schmidt has suffered and will continue to suffer significant non-economic harm. The cognitive issues that Dr. Schmidt faces are daunting. Dr. Schmidt lives life day-to-day feeling as if he lost a part of himself and his mind. As an illustration, this injury causes Dr. Schmidt isolation. Physically, Dr. Schmidt does not look disabled. When he interacts with others, they do not perceive him to have cognitive deficits. Dr. Schmidt gets frustrated when he is unable to hide his disability and others do not understand why he is forgetting their names, or even simple details like where he is and what he is currently doing. Instead of trying to explain, the literature shows that individuals with this disability will forgo interactions with others, leading to increased isolation. This is also another reason for the medical and supportive care offered in Plaintiffs' life care plan, as it helps Dr. Schmidt reintegrate with society.

Moreover, Dr. Schmidt faces daily anxiety, depression, and frustration arising out of his cognitive injury. Dr. Schmidt's frustration at his failure to improve is difficult to imagine but understandable. And physical pain is a constant problem for Dr. Schmidt. For this reason, Dr. Schmidt's medical doctors have recommended, and Dr. Schmidt has undergone, at least eight (8)

---

[325] Pl. Exh. 3 (summary present value chart).

[326] The Court also finds that the reasonable and necessary past medical expenses incurred under the Court's previous ruling (Dkt. No. 113, at 9) is $10,451 for ER services and $1,062.18 for those imaging services related to the wreck. *See* Pl. Exhs. 25 & 33.

fluoroscopic guided steroidal injections. Likewise, Dr. Schmidt has attended dozens upon dozens of physical therapy appointments. As the expert testimony revealed, this physical pain is a permanent fixture in Dr. Schmidt's life. It's one that he cannot avoid but will have to learn to cope with.

Given the extent of non-economic harm in this case, the Court awards a total of **$4,000,000 in past and future non-economic damages**.

## CONCLUSIONS OF LAW

The Court finds in favor of Plaintiff the total damages in the amount of **$6,838,879.18**. But under 28 U.S.C. § 2674, Plaintiff is not entitled to an award of punitive damages against the United States of America. Though, Plaintiff should recover his taxable costs from the Defendant. Plaintiffs are instructed to file a motion for costs within 15 days of entry of judgment. And while the United States is not liable for prejudgment interest, *see* 28 U.S.C. § 2674, the Court orders post-judgment interest from the date of filing of the transcript of the judgment with the Secretary of the Treasury through the day before the date of the mandate of affirmance. 28 U.S.C. § 1304(b)(1). Finally, Plaintiff's attorneys' fees are limited to 25% of the judgment and the Court finds that to be reasonable fees in this case. *See* 28 U.S.C. § 2678.

Any finding of fact that may also be deemed a conclusion of law is so deemed. Any conclusion of law that may also be deemed a finding of fact is so deemed. The Clerk of the Court is instructed to enter a judgment in favor of the Plaintiff and against the Defendant consistent with these findings.

Respectfully Submitted,

/s/ Tom Jacob
JAMAL K. ALSAFFAR
jalsaffar@nationaltriallaw.com
Texas State Bar #24027193
TOM JACOB
tjacob@nationaltriallaw.com
Texas State Bar #24069981
Whitehurst, Harkness, Brees, Cheng,
Alsaffar, Higginbotham, & Jacob
    PLLC
7500 Rialto Blvd, Bldg. Two, Ste 250
Austin, TX 78735
(512) 476-4346 (o)
(512) 467-4400 (f)

HENRY MOORE
henry@moorelegal.net
Texas State Bar #14341500
Law Offices of Henry Moore
1101 E. 11th St.
Austin, Texas 78702-1908
(512) 477-1663 (o)
(512) 476-6212 (f)

Attorneys for the Plaintiff

# CERTIFICATE OF SERVICE

By my signature above, I certify that a copy of Plaintiff's Proposed Findings of Fact & Conclusions of Law has been sent to the following on July 28, 2020 via the Court's CM/ECF notice system.

JAMES F. GILLIGAN
JAMES E. DINGIVAN
KRISTINA BAEHR
Assistant United States Attorneys
Western District of Texas
601 N.W. Loop 410, Suite 600
San Antonio, TX 78216-5597
Tel. (210) 384-7345
Fax (210) 384-7312
jim.gilligan@usdoj.gov