UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| JEROME SCHMIDT, | § | No. 1:18-CV-88-DAE |
| | § | |
| Plaintiff, | § | |
| | § | |
| vs. | § | |
| | § | |
| UNITED STATES OF AMERICA, | § | |
| | § | |
| Defendant. | § | |

REDACTED FINDINGS OF FACT AND CONCLUSIONS OF LAW

      This case arises out of a car collision involving a federally employed

driver.  Plaintiff Jerome Schmidt ("Plaintiff") brought this action against the United

States of America ("Defendant" or "United States") pursuant to the Federal Tort

Claims Act ("FTCA"), 28 U.S.C. §§ 1346(b)(1) and 2671–2680.  (Dkt. # 1.)  The

Court granted partial summary judgment in favor of Plaintiff, finding that the

United States caused the accident.  (Dkt. # 65.)

      The Court presided over a combined ten-day bench trial beginning on

February 10, 2020.[1]  Trial was devoted to damages caused by the accident.  Henry

---

[1] After supplemental briefing (Dkts. ## 111, 112) and a status conference hearing
(Dkt. # 117), the Court determined that it would be in the interests of justice to
allow the parties to present additional, limited testimony should they choose to do
so.  Defendant elected to present additional expert testimony, and Plaintiff elected
not to present any additional testimony.  The Court presided over one additional
day of the bench trial on July 21, 2020.

Moore, Esq., Tom Jacob, Esq., and Jamal Alsaffar, Esq., appeared on behalf of

Plaintiff, and James Gilligan, Esq., and Kristina Baehr, Esq., appeared on behalf of

Defendant.  The parties submitted proposed revised findings of fact and

conclusions of law (Dkts. ## 121, 122) on July 29, 2020.

       The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331

as this is a civil action arising under the Constitution and laws of the United States.

       In preparing these findings of fact and conclusions of law, this Court

carefully considered the record, made determinations as to relevance, materiality,

and credibility of witnesses, and ultimately ascertained the probative significance

of the evidence presented.  As required under Rule 52(a) of the Federal Rules of

Civil Procedure, this Court articulates the following findings of fact and

conclusions of law to provide a "sufficiently definite predicate for appellate

review."  Century Marine Inc. v. United States, 153 F.3d 225, 231 (5th Cir. 1998).

In following Rule 52(a), this Court need not "parse or declaim every fact and each

nuance and hypothesis," but rather this Court may limit its discussion to those facts

and legal issues that form the basis of its decision.  Id.

       The Court finds the following facts by a preponderance of the

evidence, and in applying the applicable law to such factual findings, the Court

makes the following conclusions of law.  To the extent any findings of fact may

also be deemed to be conclusions of law, they shall also be considered conclusions

of law; similarly, to the extent any conclusions of law as stated may be deemed findings of fact, they shall also be considered findings of fact.  See Compaq Computer Corp. & Subsidiaries v. C.I.R., 277 F.3d 778, 781 (5th Cir. 2001).

I.     FINDINGS OF FACT

### The Parties

1.     Plaintiff is a veteran of the United States Army who served as a tank platoon leader during the Vietnam War and was honorably discharged at the rank of First Lieutenant.  (Tr. 1135–37.)  After his honorable discharge, Plaintiff trained as a psychologist.  (Tr. 1138–39.)  Plaintiff testified that as a psychologist, he "dealt with people that had PTSD" and worked in "chemical dependency treatment" for these patients.  (Tr. 1139:9–19.)  At the time of the car accident in question, Plaintiff was 68 years old and worked part-time as a psychologist.  (Pl. Exh. 160 at 12; see also Pl. Exh. 150; Pl. Exh. 157A at 80.)

2.     Defendant is the United States of America, acting through its agency the Department of the Navy.  At all times material to this action, Defendant employed Edward R. Saylor, Staff Sergeant in the United States Marine Corps ("Staff Sergeant Saylor"), who was the driver of the other vehicle involved in the car accident with Plaintiff on October 13, 2015.  (Tr. 589–92.)  At all times material to this action, Staff Sergeant Saylor was an agent, servant, or employee of the United States of America acting within the course and scope of his employment.

3

**Plaintiff's Preexisting Conditions**

3.      Plaintiff suffered from a variety of preexisting medical conditions prior to the car collision on October 13, 2015.

4.      As a result of his service in Vietnam, Plaintiff ████████████ ████████████████████████████████████████████. (Tr. 1137–38; Pl. Exh. 157B at 3; Pl. Exh. 157a.)

5.      On June 20, 2013, Plaintiff visited one of his physicians, Dr. Charles B. Mallet, who noted that Plaintiff complained of "████████████████████ ████████████████████████████" (Pl. Exh. 157a at 85.) Dr. Mallet also noted that Plaintiff's "██████████████████████████" and that "████████████████████████████████████████████ ████████████████████." (Id.)

6.      On July 22, 2013, Plaintiff again visited Dr. Mallet who noted that Plaintiff "████████████████████" and that these tests "████████████ ████████████" (Pl. Exh. 157a at 79.) Dr. Mallet also noted that Plaintiff appears to have "██████████████████." (Pl. Exh. 157a at 80.) Based on the records and testimony before the Court at trial, there is some evidence that Plaintiff ██████████████████████████ even after the car accident in 2015. (See Pl. Exh. 157a at 158 (record from a neurosurgeon office visit from July 2016 indicates that "████████████████████████" and is a "[████████████████████]").)

4

7.    Dr. Mallet also noted that (1) ███████████████████████

████████████████████████ (see, e.g., Pl. Exh. 157a at 13, 56, 118); (2)

████████████████████████ (see, e.g., id. at 13); and (3) Plaintiff's

████████████████████████████████████████████████.

(See, e.g., id. at 80.)

8.    Plaintiff presented himself to the Department of Veterans Affairs

("VA") weeks before the car accident.  At the VA, Plaintiff was ██████████

███████████████████████.  (See Pl. Exh. 160 (the "VA Records").)[2]

On July 15, 2015, Plaintiff saw a VA psychiatrist and told her: "██████████

████████████████████████████████████████."  (Id.)  The notes

from the clinical psychologist at the VA from July 15, 2015, states the following:



(Id. at 11–12.)

_____

[2] As noted by Defendant, these VA Records were produced two months after Plaintiff's expert deadline, and thus, Plaintiff's experts seemingly did not review these records prior to rendering their opinions in this case.

9.     At trial, friends and relatives of Plaintiff testified that before the crash, Plaintiff was an active, happy, "very, very sharp" person.  (Tr. 494–95, 499, 516–18.)  None of these friends and relatives reviewed the VA Records nor were they aware that ███████████████████████████████ ███████████████████████████████████████████████ ████████████████.

10.     Plaintiff also appears to have ████████████████████████ ██████████████.  (See Pl. Exh. 151b (noting that Plaintiff "███████████ ████████████████████" prior to the motor vehicle accident).)

### Motor Vehicle Accident on October 13, 2015

11.     On October 13, 2015, Staff Sergeant Saylor drove a Government cargo van southbound on South Lamar Boulevard in Austin, Texas around 2:00 pm.  (Tr. 590–92.)  At or around 2:32 pm, Staff Sergeant Saylor approached the intersection of Lamar and Manchaca.  (Id.)  There, he attempted an unprotected left turn on to Manchaca and collided into a maroon Toyota 4-runner, which was driven by Plaintiff.  (Id.; Def. Exh. 2.)

12.     Plaintiff wore his seat belt during the collision and the force of the collision caused his airbags to deploy.  (Tr. 867–68.)  Both vehicles were damaged by the crash such that neither party drove away in their respective vehicles after the collision.  (Tr. 600, 1097.)  According to Dr. Richard Watson, the Government's

accident reconstructionist, the severity of the crash was on the low end of the spectrum (Tr. 1098), and Plaintiff's expert, Dr. Michael Freeman, testified that the "actual range [of risk of injury to Plaintiff] for this crash or the specifics of this crash for concussion risk would be 2.5 to 4.6 percent." (Tr. 674.)

13.     Following the collision, Plaintiff walked to Staff Sergeant Saylor's van while Staff Sergeant Saylor was on the phone with emergency services. (Tr. 592:19–593:6.) Staff Sergeant Saylor credibly testified that they were both a little shaken up, but they both walked to a green space in the middle of the intersection, and briefly talked before emergency services arrived. (Tr. 593:5–596:12.)

14.     Austin Peace Officer Abel Garza responded to the accident, observed the scene, spoke with the drivers about the accident and whether there was any need for medical treatment, and completed a Crash Report. (Tr. 838:2–840:3; Def. Exh. 2.) According to the Crash Report, neither driver appeared to be visibly injured and no notation of concussion was made. (Def. Exh. 2.) Officer Garza credibly testified that the drivers needed no assistance getting out of their cars, and the drivers declined assistance from Emergency Medical Services. (Tr. 839:20–840:3; see also Tr. 594:22–598:14.)

15.     Based on the testimony at trial, it appears that Plaintiff did not call family or friends to ask for their assistance leaving the scene of the accident or

going to the hospital.  (Tr. 510, 576, 614–15.)  Plaintiff got a rental car and drove

himself to the hospital.[3]  (Tr. 614:10–615:6.)

      16.    At around 4:50 pm, Plaintiff checked himself into the emergency

room ("ER") at Seton Southwest Hospital.  (Pl. Exhs. 148, 149.)  Plaintiff's



.  (Pl. Exh.

148 at 3–5.)  At 5:27 pm,                                          which a

radiologist interpreted as                                   ."  (Pl. Exh. 150

at 3.)

, and Plaintiff was discharged as "                    ."  (Pl. Exh. 148.)

      17.    At around 9:12 pm, Plaintiff went to a second ER at the University

Medical Center Brackenridge.  (Pl. Exh. 149.)  There, Plaintiff expressed

"                                " as a result of a "

                    "  (Id. at 13.)  He was said to have an "      " level

of consciousness with                          .  (Id. at 26.)  There was

                          .  (See generally Pl. Exh. 149.)

---

[3] Plaintiff testified at trial that he recently renewed his driver's license and
seemingly still drives himself to this day.  (See Tr. 1148:4–9.)

[4] Dr. Christopher Loftus, the Government's expert in neurosurgery, testified at trial
that                          , which is the best score possible and indicates
that Plaintiff is normal.  (Tr. 876:6–8.)

**Plaintiff's Medical History After the Car Crash**

18.     On October 14, 2015, the day after the wreck, Plaintiff presented

himself to Dr. Kenneth Bunch, a doctor at the Texas Orthopedics, Sports, &

Rehabilitation Associates, █████████████████████████████. (Pl. Exh.

151b.)  Dr. Bunch noted that he has "███████████████████████████████

███████████████████████████████████████████████." (Id.

at 2.)  Dr. Bunch ██████████████████████████████████████

█████████     (Id. at 7.)

19.     On October 15, 2015, Plaintiff presented himself to Dr. Andrea

Raymond, a neurologist.  (Pl. Exh. 150 at 31.)[5]  Plaintiff complained of

█████████ " █████████████████████████████████████████. (Id.)

He also reported █████████████████████████████████

█████████████.  (Id.)   After an examination, Dr. Raymond ██████████████

██████████████████████████████████████████. (Id.

at 33.)  Dr. Raymond noted that Plaintiff was "█████████████████████

█████████████████████" and ██████████████████████████. (Id.)

---

[5] The Court notes that Dr. Raymond does not appear to have reviewed Plaintiff's
VA Records.

20.   On October 22, 2015, radiologists at Austin Radiological Association ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓. (Pl. Exh. 150 at 49.)  These radiologists had an ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓. (Id.)

21.   On October 30, 2015, Plaintiff again presented to Dr. Raymond.  (Pl. Exh. 150 at 29.)  Plaintiff reported that ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓, ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ (Id.)

22.   Dr. Raymond referred Plaintiff to the Austin Center for Therapy and Assessment, LLC, for ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓. (Pl. Exh. 153c.)

23.   Dr. Wayne Dees, one of Plaintiff's experts in neuropsychology, subjected Plaintiff to a series of tests.  (Id.)  In his evaluation, Dr. Dees notes that Plaintiff "▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓" and that since the accident, "▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓." (Id. at 9.)  The summary of the results notes that:

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓

████████████████████████████████████

24.     As noted by the Government's expert in neuropsychology, Dr. Kyle

Boone, it appears that Dr. Dees is not a Board-certified neuropsychologist and that

Dr. Dees did not actually test Plaintiff himself, but rather had his assistant conduct

the examination. (<u>See</u> Tr. 1225:18–1226:7, 15–20.) The Court finds that these

facts contribute to the Court's finding that Dr. Dees' evaluations (both in

November 2015 and in October 2016) are not persuasive. The Court also finds Dr.

Boone's testimony credible about Plaintiff seemingly not performing to his true

ability during these tests as seen by the standard validity testing. (<u>See</u> Tr. 1232.)

Dr. Boone notes that the described instances of Plaintiff ████████████████

████████ are "not a symptom of concussion." (<u>Id.</u>) Dr. Boone testified credibly

that ████████████████████████████████████████████

████████████████ can "lead to cognitive abnormalities" and thus "we cannot

conclude that an equivocal concussion caused those problems, particularly since

████████████████████████████████ before the accident." (Tr. 1236:3–12.)

25.     Over the course of the next year, Plaintiff visited Dr. Cooper at the

Austin Center for Therapy & Assessment over ████████████ (<u>See</u> <u>generally</u>

Pl. Exh. 153b.) On December 21, 2015, Plaintiff was said to have "████████

████████████████████████████████████████████████ "

as well as "███████████████████████████████████
██████████████████████████████████" and

"███████████████████████████████████████

████████." (Pl. Exh. 153b at 1.)  The diagnosis was said to be "█████

████████████████████████." (Id.)

     26.     Through the course of his therapy sessions with Dr. Cooper, Plaintiff

████████████████████.  For instance, in his session on February 8, 2016,

Plaintiff is said to have "██████████████████████████

████████████████████████████" and █████████

██████████████████████████." (Pl. Exh. 153b at 25.)

     27.     On February 25, 2016, Plaintiff expressed "████████████████

█████████████████████████████████████████

█████████████████████████████████████████

████████████." (Id. at 35.)

     28.     On May 9, 2016, Dr. Cooper made note that Plaintiff discussed "█

█████████████████████████████████████████

█████████████████████" and that following the car

accident in October 2015, Plaintiff "████████████████████████

█████████████████████████████████████

███████████████████████████." (Id. at 57.)

29.     On July 25, 2016, Plaintiff presented to Dr. Cooper as ███████

and "███████████████." (Id. at 69.)  Plaintiff "█████████████████

███████████████████████████████████████████████████████████████

█████████████████████████████████████" (Id.)  Plaintiff also noted

that ██████████████████████████████████████. (Id.)

30.     Plaintiff was referred by Dr. Raymond for a neuropsychological re-

evaluation on October 4, 2016, due to "████████████████████████

███████████████████████████████████████████████████████████████

██████████████." (Pl. Exh. 153a.)  The evaluation, performed again by Dr.

Dees, diagnoses Plaintiff with a "███████████████████████████████

████████████████████" and an "█████████████████████████████████

███████████████" (Id. at 13.)  The evaluation notes that "██████████████

████████████████████████████████████████████." (Id.)

31.     On October 10, 2016, Plaintiff presented to Dr. Cooper and discussed

"██████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

█████████████████████████████." (Id. at 81.)

32.     Plaintiff's older brother, James Schmidt, testified at trial that Plaintiff

experienced a tragedy in his personal life after his son was killed in a car accident

in October 2016.  (Tr. 584–85.)  Mr. Schmidt testified that his brother is "in the

business of trying to help people get fixed, and . . . if I was a psychologist . . . I'm

fixing these folks over here, but I can't fix my own son, I would feel like a failure."

(Tr. 585:25–586:5.)

33.     Plaintiff spoke of this tragedy with Dr. Cooper as he grappled with the

loss of his son and his decision to discontinue his psychology practice.  (See Pl.

Exh. 153b at 83.)  On October 24, 2016, Dr. Cooper noted:



34.     Dr. Raymond ████████ testing for Plaintiff in late 2016.  On

October 3, 2016, due to an ████████ that showed "████████

████," Dr. Raymond ████████. (Pl. Exh. 150 at 6, 9.)

Dr. Julio Chalela, the Government's expert neurologist, testified that this medicine

---

[6] EEG or electroencephalogram is an evaluation of electrical activity in the brain.

is ███████████████████████████████████████████

████████████████████████████████████████████

████   (Tr. 729:3–15.)  Upon his review of the EEGs that Dr. Raymond

interpreted, Dr. Chalela testified that he "had no reason to doubt her interpretation

of the EEG."  (Tr. 693.)  Dr. Chalela also credibly testified at trial that a mild TBI

"would not be expected to cause ████████" based on the facts of this case.  (Id. at

16–17.)  Dr. Chalela expressed that "there is no test where the MRI or EEG or

whatnot . . . is diagnostic of dementia," but rather, it is an "entirely clinical

diagnosis made by a neurologist."  (Tr. 689:10–20.)

    35.    On January 30, 2017, Plaintiff and one of his attorneys visited Dr.

Raymond.  (Pl. Exh. 150 at 3.)  Dr. Raymond notes that in the "█████████

████████████████████████████████████████████

███████████████████████████████████████

████████████████████████████████."  (Id.)  Dr. Raymond

notes ████████████████████████████████████████

████████████████████████████████████

██████████████."  (Id.)

    36.    Plaintiff underwent a series of neuropsychological tests with Dr.

Robert Thoma, one of Plaintiff's experts in neuropsychology, in New Mexico in

June 2018.  (Tr. 170.)  Dr. Erin Bigler, another of Plaintiff's experts in

neuropsychology, assisted Dr. Thoma in administering these tests for a few days in 2018. (Tr. 446.)

37.     Dr. Thoma testified at trial that he did not believe that Plaintiff being a psychologist gave Plaintiff an advantage during this testing because "he understood the logic of giving them but hadn't seen these tests." (Tr. 186–87.) Notably, however, Plaintiff did ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓. (Tr. 199:3–4.) Furthermore, as noted above, the VA Records from July 2015 contain ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓ prior to the motor vehicle accident, which led him to say to the VA that "▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓." (Pl. Exh. 160 at 11 (noting that Plaintiff had ▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓).)

38.     In addition, as noted by Dr. Boone, the Government's expert in neuropsychology, Dr. Thoma is not Board-certified in neuropsychology and did not conduct the examinations on Plaintiff himself. (Tr. 1250:3–1251:12.) It also appears that Dr. Thoma's team inadequately used performance validity testing to ensure that Plaintiff performed to true ability. (See Tr. 1254–1256 (noting that Plaintiff in one of the tests "is not performing in any way, shape or form as do patients with actual brain injury and arguably he's even doing worse than the

typical, non-credible patient").)  In light of these issues, these neuropsychological

tests and subsequent opinions made by Dr. Thoma and Dr. Bigler lack credibility.

39.     Plaintiff underwent an additional MRI in 2018.  (Pl. Exh. 16.)  At trial,

Dr. Travis Snyder, Plaintiff's expert in neuroradiology, interpreted and compared

the 2018 MRI to the other two MRIs.  (Tr. 57–58.)  While Dr. Snyder is Board-

certified and an expert in neuroradiology, a neurologist typically is in charge of

interpreting MRI imaging.  (Tr. 686:2–10.)  As such, Dr. Snyder's testimony

interpreting these MRI images is less persuasive than the testimony of Dr. Julio

Chalela, the Government's expert in neurology.  Importantly, Dr. Chalela found

that the MRIs from different years were not "acquired in the same fashion" and

that the "slice thickness" was not the same for each image, thus essentially

comparing "apples and oranges."  (Tr. 694.)  The Court also finds it persuasive that

Dr. Christopher M. Loftus, the Government's expert in neurosurgery, testified

credibly that the ███████████ ████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████  (Tr. 866.)

40.     Over the course of a week in 2018, Plaintiff's expert in neuroscience,

Dr. Jeffrey Lewine, subjected Plaintiff to a series of tests including MEG[7] and EEG

---

[7] MEG stands for magnetoencephalography, a neuroimaging technique.

at the Mind Research Network in New Mexico, intending to figure out "if a convergent validity exists in the mechanism of injury." (Tr. 223:19–22; 250:14–24.) Dr. Lewine testified that he believed that Plaintiff suffered traumatic brain injury due to the October 2015 crash. (See Tr. 281–90.) Dr. Lewine based this assessment on the behavioral testing, EEG testing, MEG, and Dr. Snyder's MRI findings. (Id.) Importantly, Dr. Chalela, after reviewing Dr. Lewine's testimony, report, and presentation produced by the Mind Research Network, disagreed that there was a "secondary cascade" that followed the primary injury to the brain; Dr. Chalela instead opined that there was no traumatic brain injury as a result of the car collision and that Plaintiff's comorbidities account for the current injury. (Tr. 738–39.) The Court finds Dr. Chalela's testimony credible in this regard.

## II.    CONCLUSIONS OF LAW

Under the "eggshell skull" doctrine, a defendant must compensate a plaintiff "for unforeseeable injuries flowing from some pre-existing physical condition." Dahlen v. Gulf Crews, Inc., 281 F.3d 487, 495 (5th Cir. 2002) (citing Munn v. Algee, 924 F.2d 568, 576 (5th Cir. 1991)); see also Rest. 2d of Torts § 461 (1977) ("The negligent actor is subject to liability for harm to another although a physical condition of the other which is neither known nor should be known to the actor makes the injury greater than that which the actor as a reasonable man should have foreseen as a probable result of his conduct."). The essence of the rule is

simple: "The defendant takes the plaintiff as he finds him." Koch v. United States, 857 F.3d 267, 273 (5th Cir. 2017).

Plaintiff bears the burden of showing that his injuries were caused by the car collision in 2015 (i.e. that his current physical condition would not have been at this level had the car collision not occurred). Rumzek v. Lucchesi, 543 S.W.3d 327, 337 (Tex. App. 2017) (noting that a plaintiff bears the original burden of proving damages resulting from a defendant's negligence). Then once proximate cause is established, Defendant must show that the damages claimed by Plaintiff should be offset or discounted due to a preexisting condition.

Generally, Texas law affords the trier of fact great discretion in considering evidence on the issue of damages. In re State Farm Mut. Auto. Ins. Co., 483 S.W.3d 249, 263 (Tex. App.—Fort Worth 2016, no pet.). Where the plaintiff has uncontroverted, objective evidence of injury and the causation of the injury has been established, appellate courts are more likely to overturn a jury finding of no damages for past pain and mental anguish. Id.

The Court has already determined that the United States is liable for negligence under Texas law. (Dkt. # 65.) The purpose of trial was to assist the Court in delineating which damages were proximately caused by the Government's negligence. Below, the Court analyzes (1) whether the Government's negligence caused Plaintiff's injuries and (2) the proper amount of damages to award.

## Whether the Government's Negligence Caused Plaintiff's Injuries

For this Court's purposes, the key inquiry is whether and to what extent the Government's negligence caused Plaintiff's injuries. It is undisputed that, after the car crash on October 13, 2015, Plaintiff was shaken up and went to two different ERs complaining of ███████████████████████████ ███. (See Pl. Exh. 148 at 3–5.) What lies in dispute is whether Plaintiff's cognitive difficulties post-crash were triggered by the Government's negligence or whether the condition of Plaintiff's brain and cognitive difficulties stems from preexisting conditions that were not exacerbated or caused by the car collision on October 13, 2015. After hearing the evidence from various experts on both sides of the case and carefully assessing the credibility of the witnesses and experts, the Court finds that Plaintiff was in fact suffering at the time of the crash from a progressive brain disease and that his cognitive impairment to date would have occurred whether or not the Government acted negligently.

The Court finds that despite the extensive testimony from experts from each side, the Government's experts ultimately were more persuasive. Dr. Chalela as well as Dr. Loftus and Dr. Boone, testified credibly that Plaintiff was already on the trajectory for this level of cognitive impairment prior to the car collision in October 2015. The Court finds it particularly persuasive that the only neurologist brought in to testify at trial, Dr. Chalela, credibly opined that "small

vessel disease" is the "leading explanation" for Plaintiff's condition besides the car accident. (Tr. July 21 at 23.) Dr. Chalela explained that "in most patients that we see with cognitive impairment" there is a "mixed bag of conditions causing cognitive impairment with usually one leading explanation." (Id.) Dr. Chalela credibly testified that Plaintiff's cognitive issues are most consistent with



" as signaled by

. (Tr. 718–19.) Dr. Chalela testified that the

that predates the motor vehicle accident. (Tr. 717–19.)

The Court also finds Dr. Chalela's testimony persuasive that no element in Plaintiff's clinical history supports a post-concussive syndrome finding. While Dr. Raymond originally noted to the contrary that 

, she did not elaborate further and in fact refused Plaintiff's request for her to testify at trial about the causation of Plaintiff's injuries. In addition, the Court finds that the neuropsychology testing Plaintiff was subjected to after the crash is less than persuasive. Based on the record, the Court determines that Plaintiff's mental condition did not change in any way due to the accident. Nor does the evidence support a finding that Plaintiff performed to the best of his

ability on these tests, and as such, the Court declines to rely upon them in reaching its conclusion.

In light of the foregoing, the Court finds that Plaintiff did not show to a reasonable degree of medical probability that Plaintiff's cognitive condition was proximately caused by the Government's negligence during the motor vehicle accident on October 13, 2015.  However, the Court does find that Plaintiff's ███████ ████████████████████████████████████████, were in fact exacerbated by the accident in question.  With these findings in mind, the Court determines that Plaintiff should be awarded the following damages:

### Economic Damages

i.  Past Medical Expenses

The record contains a portion of Plaintiff's past medical records as the entirety of the medical records were not introduced through a testifying witness. (See generally Dkt. # 113.)  There is no disagreement that Plaintiff's medical bills related to his Seton ER visit and related to his initial imaging were incurred as a result of the October 13, 2015 accident.  (Id.)  The Court finds these expenses are directly attributable to the Government's negligence and reasonable; **Plaintiff may recover these expenses as stated in Plaintiff's Exhibits 25 and 33.**

As for the other past medical expenses, the Court gave Plaintiff many opportunities to introduce these medical bills through a testifying witness to

discuss the reasonableness of these expenses.  Plaintiff chose only to rely on his

life care planner, Dr. Christine Vidouria, to discuss these expenses and did not use

her testimony to introduce the medical bills into evidence.  The Court also notes

that Plaintiff did not list any monetary recovery amount for any past medical

expenses in the proposed revised findings of fact and conclusions of law.  Given

the Court's finding that the Government's negligence was not the cause of

Plaintiff's cognitive injuries, the Court similarly finds that the other past medical

expenses incurred by Plaintiff are not recoverable from the Government.

      ii.  Future Medical Expenses

Under Texas law, a plaintiff must provide evidence showing a

reasonable probability that medical expenses will be incurred and the probable cost

of such expenses to recover for future medical expenses.  Gaytan v. Dallas Area

Rapid Transit, No. 05-17-00116-CV, 2018 WL 2455319, at *3 (Tex. App. June 1,

2018).  Here, Plaintiff seeks future expenses for back pain and for his cognitive

decline as a result of the car accident.  Notably, Dr. Vidouria's life care plan

provides recommendations for "reasonable and necessary medical treatments and

costs . . . related to the sequalae from Dr. Schmidt's brain injury" and a "small

portion of her life care plan" is "dedicated to those orthopedic back injuries" that

she found were related to the car accident.  (Dkt. # 121.)  As noted above, the

Court will award past medical expenses for Plaintiff's neck pain, and as discussed

below, the Court will award noneconomic damages as a result of the car collision

for the exacerbation of Plaintiff's neck pain, PTSD and anxiety.  (See Dkt. # 122

(citing Akpan v. United States, ECF No. 48 (S.D. Tex. Feb. 21, 2018) (awarding

pain and suffering damages even after plaintiff failed to provide testimony of the

reasonableness of medical charges resulting from a car accident)).)

But as for Plaintiff's ███████, the Court finds that the evidence in

the record is insufficient to conclude that Plaintiff's ██████████████ was

caused or exacerbated by the Government's negligence as seen by the records from

Dr. Bunch.[8]  Thus, the Court will not award damages for Plaintiff's ███████ and

will solely consider whether Plaintiff should recover due to his cognitive decline,

████████████████████████████████████████.

Plaintiff's experts testified extensively about Plaintiff's cognitive

decline and in particular, whether the accident proximately caused Plaintiff's

cognitive decline.  As noted above, the Court did not find this testimony credible in

light of other evidence in this case.  There is also little testimony about the

reasonableness of these future expenses.  See Cate v. Posey, No. 05-17-01216-CV,

2018 WL 6322170, at *4 (Tex. App. Dec. 4, 2018) ("The only requirement to

---

[8] While the back pain was preexisting and not exacerbated by the crash, the Court finds that Plaintiff's neck pain was aggravated by the crash.  (See Pl. Exh. 151b at 2.)

support an award of future medical expenses is that there be evidence in the record of the reasonable value of past medical treatment and to establish the probable necessity of future medical treatment." (citing Thate v. Tex. & P. Ry. Co., 595 S.W.2d 591, 601 (Tex. App.—Dallas 1980, writ dism'd)).

The expert who did testify for Plaintiff about these future medical expenses was Dr. Christine Vidouria, a practicing physician in physical medicine and rehabilitation or physiatry and a certified life care planner. (Tr. 779, 782.) When preparing her life care plan, Dr. Vidouria testified that she reviewed the medical records, diagnostic tests run on Plaintiff, met with Plaintiff prior to drafting the plan, and reviewed deposition transcripts. (Tr. 783–85.) Dr. Vidouria concluded that Plaintiff's medical services and costs were caused by the "back and brain injuries he suffered in the October 13, 2015 crash." (Tr. 786:15–21.)

Despite the extensive testimony by Dr. Vidouria, the Court finds that there were a number of key facts pertaining to Plaintiff's preexisting conditions and family history that were not factored into Dr. Vidouria's life care plan which makes her testimony less credible and persuasive. The Court finds it unpersuasive that Dr. Vidouria could reasonably conclude that Plaintiff's back issues were the result of the accident based on the other testimony at trial. Furthermore, the Court finds that the life care plan had some deficiencies that also make it less persuasive. For instance, the life care plan did not account for Plaintiff's history of smoking

(Tr. 937:1–4, 967:7–9, 1010:12–21), Plaintiff's family history including the cause of his parents' deaths (Tr. 937:16–18, 964:23–965:5, 967:10–12), the sudden death of Plaintiff's son (Tr. 584–85), and the fact that Plaintiff was semi-retired at the time of the accident (Pl. Exh. 160 at 12). Furthermore, Dr. Vidouria testified at trial that in her opinion, Plaintiff "did not have a neuro cognitive disorder before the accident," which is inaccurate based on the VA Records which Dr. Vidouria did not take into account when drafting her life care plan for Plaintiff. (Tr. 823:14–19; 941:9–13.) The Court is also perplexed by Dr. Vidouria's decision not to speak to Plaintiff's treatment providers, including Dr. Raymond and Dr. Mallet, to ensure that her recommendation was consistent with the treatment and recommendation made by treating physicians. (Tr. 937:5–15, 955–58.) In light of these oversights as well as others, the Court finds Dr. Vidouria's assessment largely lacks credibility. See Settles v. United States, No. 5:17-CV-1272, 2019 WL 2565264, at *4 (W.D. Tex. May 3, 2019) (finding that the "analytical gap" between the analysis of comorbidities and the expert's estimate of how many years plaintiff had to live was "too wide" and thus prohibiting testimony about any specific term of years for life expectancy).

The Court is persuaded, however, that family members of Plaintiff were concerned about his driving, taking medication properly, and getting to medical appointments. It is obvious that Plaintiff is on the decline and

26

progressively getting worse.  But this Court does not find that around-the-clock home care is warranted in Plaintiff's case as a result of Defendant's negligence.[9] Because Plaintiff has failed to show that his cognitive decline would not be at this point but-for the Government's negligence, the Court will not award future medical expenses.  Furthermore, as noted above, the Court finds that the evidence presented at trial does not support a finding of future medical expenses for Plaintiff's neck pain exacerbated by the car collision nor for his anxiety and PTSD.  As discussed below, however, the Court will award Plaintiff non-economic damages.

      iii.  <u>Lost Earnings</u>

          The Court finds that Plaintiff has not shown that he lost wages as a result of the car collision on October 13, 2015.  Plaintiff was said to be only working part-time at the time of the accident, and the record supports a finding that Plaintiff was in the process of retirement prior to the crash and stopped practicing psychology after his son's sudden and tragic death.  (<u>See</u> Pl. Exh. 153b at 83.)  The Court shall not award recovery for lost earnings.

---

[9] While it may at some time become necessary for Plaintiff to receive 24-hour home care, the Court finds this would have occurred in the absence of the accident as noted above.

**Non-Economic Harm**

"The presence or absence of pain is an inherently subjective question for which the plaintiff bears the burden of production and persuasion." Thompson v. Stolar, 458 S.W.3d 46, 61–62 (Tex. App. 2014). This is not a situation where the evidence of pain is "conflicting, scant, or more subjective than objective." Rumzek, 543 S.W.3d at 333. Rather, Plaintiff's pain and suffering exacerbated by the car collision is documented extensively in his sessions with Dr. Raymond and Dr. Cooper, and further elaborated upon by witnesses at trial. Thus, the Court concludes that Plaintiff should be awarded damages for pain and suffering. There is no doubt that Plaintiff went to two different ERs in the aftermath of the car collision suffering from neck pain. It is also abundantly clear that Plaintiff suffered extensive emotional pain and suffering as a result of the car crash as seen by his sessions with Dr. Raymond and Dr. Cooper. The crash aggravated Plaintiff's existing PTSD, anxiety, and neck pain. The Court finds that the car accident contributed to Plaintiff's inability to live life as he had before the crash to a degree, and the crash certainly increased his depression and anxiety. **As a result of the pain and suffering associated with the accident and its aftermath, the Court awards Plaintiff $200,000 in pain and suffering.**

## CONCLUSION

This order constitutes **FINAL JUDGMENT**.  The Clerk of Court is instructed to **CLOSE THIS CASE**.

**IT IS SO ORDERED.**

**DATED:** Austin, Texas, August 28, 2020.

David Alan Ezra
Senior United States District Judge